No. 2017-1016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## ART + COM INNOVATIONPOOL GMBH
**Plaintiff-Appellant**

v.

## GOOGLE INC.
**Defendant-Appellee**

---

### CORRECTED BRIEF OF PLAINTIFF-APPELLANT

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IN CASE NO: 1:14-CV-00217 JUDGE TIMOTHY B. DYK

BAKER BOTTS L.L.P.
Scott F. Partridge
(Principal Attorney)
L. Gene Spears
Michael Hawes
One Shell Plaza
910 Louisiana
Houston, Texas  77002
713.229.1234
713.229.1522 (Facsimile)
E-mail scott.partridge@bakerbotts.com

Attorneys for Appellant

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ART+COM Innovationpool GmbH          **v.**          Google Inc.

Case No.          2017-1016

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| ART+COM Innovationpool GmbH | ART+COM Innovationpool GmbH | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Baker Botts LLP: Scott Partridge, L. Gene Spears, Michael Hawes, C. Ryan Pinckney, Thomas Rooney: see attached page

12/2/2016
Date

/s/ Scott F. Partridge
Signature of counsel

Please Note: All questions must be answered

Scott F. Partridge
Printed name of counsel

cc:   All counsel of record

Reset Fields

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
ART+COM Innovationpool GmbH v. Google, Inc.

17-1016
CERTIFICATE OF INTEREST
Continuation Page

4. The names of all law firms and the partners or associates that appeared for the party or  amicus now represented by me in the trial court or agency or are expected to appear in  this court (and who have not or will not enter an appearance in this case) are:

Baker Botts L.L.P. cont'd: Michelle Jacobson Eber, M. Natalie Alfaro, Jennifer Nall;

Lisa C. Kelly and Lisa M. Thomas-no longer with this firm.

Farnan LLP: Michael J. Farnan, Brian E. Farnan

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES.........................................................1

STATEMENT OF THE CASE.............................................................2

STATEMENT OF THE FACTS ..........................................................4

    A.    ACI And Its Invention.........................................................4

    B.    The '550 Patent And The Problems Solved Therein ...........5

    C.    SIGGRAPH '95 and SRI TerraVision ...............................14

    D.    Google's Exposure To ACI's TerraVision System............16

    E.    Google's Dealings With ACI ............................................17

    F.    The Trial and ACI's Infringement Case............................18

    G.    The Trial and Google's Invalidity Case ............................24

        1.    The T_Vision Paper .................................................24

        2.    SRI TerraVision ......................................................28

    H.    Post-Trial Motions............................................................33

SUMMARY OF THE ARGUMENT .................................................33

ARGUMENT ..................................................................................36

I.      STANDARD OF REVIEW .....................................................37

II.     GOOGLE INFRINGED THE '550 PATENT.............................38

    A.    "Node-Skipping" is Irrelevant to Claim 1 .........................38

    B.    "Node Skipping" is of Little Relevance to the Accused Products......41

III.    THE '550 PATENT WAS NOT PROVEN INVALID ................................42

    A.    Google Has No Obvious Case Against Claims 1, 14 and 28.............42

    B.    The T_Vision Paper Does Not Anticipate Any Asserted Claim.........44

    C.    SRI TerraVision Was Not a Public Use of Any Asserted Claim........47

        1.    Dr. Goodchild's Testimony Lacks Foundation .......................50

        2.    No Evidence for the Practice of Steps (b), (c), (f) and (g)........51

        3.    No Evidence for the Practice of Claim 3 .................................53

4.    No Evidence the Invention Was Discernable in SRI
TerraVision ................................................................................54

5.    No Evidence SRI TerraVision was Ready for Patenting..........56

D.    Claim 3 Was Not Proven Obvious ......................................................58

IV.    WILLFUL INFRINGEMENT MUST BE TRIED ON REMAND ..............60

CONCLUSION ....................................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*ActiveVideo Networks, Inc. v. Verizon Comm'n, Inc.*,
  694 F.3d 1312 (Fed. Cir.2012) ...........................................................43

*Adenta, GmbH v. Orthoarm, Inc.*,
  501 F.3d 1364 (Fed. Cir. 2007) ..................................................47, 49

*Apple, Inc. v. Samsung Electronics Co.*,
  App. No. 2015-1151, slip op. (Fed. Cir. Oct. 7, 2016).......................59

*Bell Communications, Inc. v. Vitalink Communications Corp.*,
  55 F.3d 615 (Fed. Cir. 1995) ..............................................................42

*Citing Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*,
  620 F.3d 1305 (Fed. Cir. 2010) ..........................................................60

*Delano Farms Co. v. California Table Grape Comm'n*,
  778 F.3d 1243 (Fed. Cir. 2015) ...................................................54, 55

*Dey, L.P. v. Sunovion Pharmaceuticals, Inc.*,
  715 F.3d 1351 (Fed. Cir. 2013) ...................................................54, 55

*Egbert v. Lippmann*,
  104 U.S. 333 (1881)............................................................................55

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
  149 F.3d 1309 (Fed. Cir. 1998) ..........................................................37

*Finnigan Corp. v. Int'l Trade Comm'n*,
  180 F.3d 1354 (Fed. Cir. 1999) ..........................................................48

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
  136 S.Ct. 1923 (2016)...........................................2, 36, 37, 60, 61, 62

*IMS Technology, Inc. v. Haas Automation, Inc.*,
  206 F.3d 1422 (Fed. Cir. 2000) ..........................................................37

*In re Seagate Technology, LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) (*en banc*) ...................... 3, 4, 6, 8, 36, 60, 61, 62

*Invitrogen Corp. v. Biocrest Manufacturing, L.P.*,
  424 F.3d 1374 (Fed. Cir. 2005) ...........................................................56

*Jamesbury Corp. v. Litton Indus. Prods., Inc.*,
  756 F.2d 1556 (Fed. Cir. 1995) ...........................................................44

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 116 S.Ct. 1384
  (1996) ..............................................................................................2, 37

*Moleculon Research v. CBS, Inc.*,
  793 F.2d 1261 (Fed. Cir. 1986) ...........................................................47

*Motorola, Inc. v. Interdigital Technology Corp.*,
  121 F.3d 1461 (Fed. Cir. 1997) ...........................................................44

*Pfaff v. Wells Elecs., Inc.*,
  525 U.S. 55 (1998)..............................................................................56

*Titanium Metals, Inc. v. Banner*,
  779 F.2d 775 (Fed. Cir. 1985) .............................................................44

*Typewright Keyboard Corp. v. Microsoft Corp.*,
  374 F.3d 1151 (Fed. Cir. 2004) ...........................................................44

*Upjohn Co. v. Mova Pharmaceutical Corp.*,
  225 F.3d 1306 (Fed. Cir. 200) .............................................................43

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
  721 F.2d 1540 (Fed. Cir. 1983) ...........................................................44

*Zenith Electronics Corp. v. PDI Communication Systems, Inc.*,
  522 F.3d 1348 (Fed. Cir. 2008) .....................................................47, 49

## STATUTES

28 U.S.C. § 1295(a) ....................................................................................1

28 U.S.C. § 1331 and § 1338(a),(b)...........................................................1

35 U.S.C. § 102(b) ....................................................................................56

## STATEMENT OF RELATED CASES

There are no cases related to this one.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction is established by 28 U.S.C. § 1331 and § 1338(a),(b).  A final judgment closing the case was entered on May 31, 2016 and amended on July 12, 2016.  ACI timely filed its notice of appeal on October 3, 2016.  This Court's jurisdiction is established by 28 U.S.C. § 1295(a).

## STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports a jury's verdict that claims 1, 3, 14 and 28 (asserted claims) of U.S. Patent No. Re 44,550 ('550 Patent) are not infringed where the sole argument for noninfringement is:  (1) irrelevant to those claims as construed; and (2) relates only to an exceptional mode of operation for the accused products.

2.    Whether substantial evidence supports a jury's verdict that claims 1, 3 and 14 were anticipated by an alleged prior publication (the T_Vision Paper) that does not disclose multiple steps of the claimed method.

3.    Whether substantial evidence supports a jury's verdict that the invention of the asserted claims was placed in public use where:  (1) no specific evidence was offered purporting to align those claims against an individual concrete public use; (2) the evidence offered does not match the claimed method

steps with those purportedly placed in public use; and (3) no attempt was made to prove that systems purportedly placed in public use were ready for patenting, or that the claimed invention was publicly-ascertainable from those systems.

4.    Whether conclusory testimony of Defendant's expert provides substantial evidence to support the jury's verdict on obviousness.

5.    Whether, on any remand in this matter, the district court's summary judgment of no willful infringement should be vacated in light of intervening precedent, specifically *Halo Electronics, Inc. v. Pulse Electronics, Inc*., 136 S.Ct. 1923 (2016).

## STATEMENT OF THE CASE

In a complaint filed February 20, 2014, Art+Com International GmbH (ACI) sued Google, Inc. (Google) for infringement of the '550 Patent based on Google's distribution and support of its Google Earth product line.  In an answer filed April 24, 2014, Google denied infringement and raised various affirmative defenses while asserting no counterclaims.

The case was assigned initially to Judge Richard Andrews, who supervised the discovery and *Markman* process, issuing opinions on claim construction and on both parties' motions for summary judgment.  On April 28, 2016, and without the guidance the Supreme Court would later provide in *Halo Electronics*, Judge Andrews granted Google's motion for summary judgment that the '550 Patent was

not willfully infringed. His reasoning was grounded entirely on the now-irrelevant "objective prong" of *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (*en banc*). Appx6095-6096.

On May 5, 2016, the Chief Judge of the Court of Appeals for the Third Circuit temporarily assigned this case to the Honorable Timothy B. Dyk of this Court, who presided over pre-trial proceedings and the trial itself, entered judgment on the jury's verdict and decided the parties' motions for post-trial relief.

On May 23-27, 2016, this was case was tried to a jury. At the close of argument and after receiving final instructions from the court, that jury -- in the course of forty-five minutes -- ate lunch, elected a foreperson and answered six questions finding that:

- the asserted claims of the '550 Patent were not infringed

- an alleged prior art system (SRI TerraVision) was used publicly before the critical date and "anticipate[d]" the asserted claims of the '550 Patent

- the T_Vision paper was a printed publication that anticipated claims 1, 14 and 28 of the '550 Patent

- the T_Vision paper in combination with another reference (the Global Mapping Patent) "and the knowledge and skill of a person of ordinary

3

skill" provided clear and convincing evidence that claim 3 was invalid as obvious. Appx0101-0105.

Based on its answers to these questions, the jury declined to answer two Questions (Nos. 4 and 7) directed to obviousness and a third (No. 9) directed to damages. *Id*. Both parties filed motions for post-trial relief, which Judge Dyk denied on September 9, 2016.

## STATEMENT OF THE FACTS

ACI's invention, the one disclosed and claimed in the '550 Patent, enabled real time navigation of digital terrain for the entire earth. That invention was employed in ACI's TerraVision (aka T_Vision) application, which was known to individuals who would go on to develop the accused Google Earth products several years later. After incorporating that invention in these products, Google convinced a jury to excuse its conduct. They did this by diverting the jury's attention from what should have been the core inquiry, i.e., one that looks to the four corners of a claim to assess validity and infringement. Unfortunately, those four corners played little role in Google's defense or in the jury's verdict accepting that defense.

A.    ACI And Its Invention

Based in Berlin, Germany, ACI provides specialized installations and applications for institutional clients, working at the intersection of art and technology. Appx0340-0341, Appx0825-0826. Late in 1993, one of ACI's

4

inventors (Pavel Mayer) met with a representative (Mr. Ishibashi) from Japan's WeatherNews. Appx0342. At that time, WeatherNews was attempting to use satellite imagery in 3D weather reports. Appx0342-0343. But the images were so slow in loading that by the time a report was put together, the weather may have changed. Appx0343. Applying principals Mr. Mayer described as "cut, align and scale," ACI upped the image load rate by a factor of fifty. Appx0350-0352. As Mr. Mayer recounted:

> When we -- well, when I saw it first running, I mean, this huge map, I do just zoom in and zoom out and probably as nobody ever has seen it before, at least I hadn't and nobody in the company. So yeah, I remember me going around and dragging everyone in and to share my excitement about it. Appx0353.

In 1994, ACI received funding from Deutsch Telecom to further refine its invention. Appx0371-0372. ACI at first called its application "TerraVision." Appx0361. Later, when ACI learned of another "TerraVision," it began using "T_Vision" as a public reference while retaining "TerraVision" internally. Appx0362. After exploring various ways for visualizing terrain data, ACI arrived at the one claimed in the '550 Patent late in 1995. Appx0558. The jury was shown a video (PTX267, Appx5044) of TerraVision's operation. Appx0365.

B.    The '550 Patent And The Problems Solved Therein

The '550 Patent discloses and claims methods for pictorially representing space-related data from a selectable viewpoint. As laid out in its first column, the

5

state of the art at the time consisted of weather maps, flight simulators and electronic maps, (1:15-21, 1:30-41),[1] systems "based on a fixed set of stored data." (1:55-56).  The system ACI was contemplating would be handling more data than could fit in a computer memory.  Appx0359.  So rather than store all of it on the device that would display it, "[t]he solution was to request data in a way that you don't have to know all the data that is there, so that you ask the data sources to come up in a specific way with the data you need without, but without knowing the exact data in advance."  *Id*.  As this solution is plainly defined in the steps of claim 1, it is useful to address them sequentially.

> *A method of providing a pictorial representation of space-related data of a selectable object, the representation corresponding to a view of the object by an observer with a selectable location and a selectable direction of view comprising*:

As ACI's expert, Dr. Castleman, testified, this preamble provides an overview of what the claim covers.  Appx0627.  The term "space related data" was construed to mean "data related to a geographical location."  Appx6037.  In the context of Google Earth, which Dr. Castleman demonstrated for the jury, Appx0626-0627, the "pictorial representation" is the picture on the screen and the "selectable object" starts with the earth itself.  Appx0628.  When an Earth user places a viewpoint above the planet, this is the "selectable location."  *Id*.  The

---

[1]    Citations to the '550 Patent (Appx0106-0126) are in the form of "column:line"

"selectable direction of view" was demonstrated through imagery of the Kaiser Wilhelm Memorial Church in Berlin, which could be viewed by users from different directions. Appx0627-0628. The pictorial representation provided, e.g., by Google Earth is a view of an object by an observer with a selectable location. Appx0628.

*(a) providing a plurality of spatially distributed data sources for storing space-related data;*

The term "plurality of spatially distributed data sources" was construed to mean a "plurality of geographically separate data sources." Appx6037. As Dr. Castleman explained, the amount of data required to visualize the entire earth cannot fit in a local computer's memory, e.g., in a smartphone's memory. Instead, those data will be stored in separate locations, such as in data centers having a large number of computers. Appx0630. See also 2:53-56 ("By virtue of the fact that the data are called up, generated and/or stored in a spatially distributed manner, the magnitude of the available database is not limited by the size of the central data memory").

*(b) determining a field of view including an area of the object to be represented through a selection of a distance of the observer to the object and an angle of view of the observer to the object;*

As Dr. Castleman explained, one way of determining a field of view is with a cursor that allows the user to specify what area on the earth they want to see. Appx0633. As implemented, e.g., in Google Earth, source code would take that

user input and determine the field of view, i.e., what part of the planet's surface will be depicted in the picture to be provided. *Id*. One way of doing this is with a virtual camera and a virtual pyramid (called a "frustum") extending from its lens to intersect the earth (Appx0635-0666):



What's inside the quadrilateral becomes the "footprint" of the camera. Appx0635. Areas of the earth that fall outside are not visible to the camera and need not be shown to the user. *Id*.

> *(c) requesting data for the field of view from at least one of the plurality of spatially distributed data sources;*

8

Once the field of view is determined per step (b), it is possible to determine which images will be required to build a pictorial representation to be shown to the user.  In this step, those image data are requested from at least one of the spatially distributed data sources.  In the context of Google Earth, this request is made by the Google Earth application running on the local computer itself.  Appx0661-0662.

    *(d)    centrally storing the data for the field of view;*

This step was construed to mean "storing requested data for the field of view in memory at the location of the request."  Appx6036.  When the request for data for the field of view selected by the user is made, e.g., from a smartphone running the Google Earth application, then that memory is the smartphone's memory because it is the memory at the location of the request.  The source code running the Google Earth application will cause requested data/images to be stored on memory in the user's device, typically in a cache or temporary storage memory, which can be flushed and replaced with new data as the application progresses. Appx0673-0674.

    *(e)    representing the data for the field of view in a pictorial representation having one or more sections;*

This step was construed initially to require "displaying the data for the field of view in a pictorial representation having one or more sections."  Appx6037. Later, the claim construction was supplemented to make clear that this step (and

with it, claim 1) does not require displaying an actual visual image to a user "using the hardware of a display device or using generic graphics software or firmware associated with that display device." Appx6062. In other words, this step is practiced by the application source code that "renders" the image for display (i.e., prepares the image for eventual display) by putting together the image data for the field of view. Appx0682.

In dynamic images, multiple frames are displayed each second. After steps (a)-(e) of claim one are completed, the user will see the first frame of the pictorial representation of their selected field of view. Appx0694. By preparing that image in this way, i.e., by focusing the user's device only on the data of immediate interest both in terms of what is requested and what is to be displayed, the claimed invention clears the "local memory" capacity hurdle to pictorially represent any portion of the entire earth selected by the user at each instant of time.

Steps (f) and (g), which provide further refinement to the sections already pictorially represented as provided in step (e), define how those sections are prepared for display in subsequent frames. The context for these steps is provided at lines 34-48 of column 3. The patent is directed to systems that enable users to navigate a virtual earth by changing (at whatever pace they desire) their location or direction of view. "Immediately after this alteration in field of view, the method accordingly can be restarted." 3:34-35. When that happens, and to avoid

interruptions due to the shift in field of view, the data for the new image will -- once steps (a)-(e) are practiced -- be displayed at lower resolution as such data "are always available."  3:43-46.  Steps (f) and (g) define how this lower-resolution image is sharpened to the desired resolution:

> *(f) using a computer, dividing each of the one or more sections having image resolutions below a desired image resolution into a plurality of smaller sections, requesting higher resolution space-related data for each of the smaller sections from at least one of the plurality of spatially distributed data sources, centrally storing the higher resolution space-related data, and representing the data for the field of view in the pictorial representation.*
>
> *(g) repeating step (f), dividing the sections into smaller sections, until every section has the desired image resolution or no higher image resolution data is available.*

Step (f) explicitly refers back to the "one or more sections" pictorially represented through step (e).  The term "image resolution" was construed to mean "the level of detail or spatial precision contained in an image."  Appx6036.  Step (f) was construed initially to require that its sub-steps be performed in order, i.e., that sections be divided before higher-resolution space-related data are requested.  During trial, the court supplemented this construction and instructed the jury that step (f) must be practiced before step (g).  Appx1551.

If we begin, e.g., with a low resolution map of Europe, North Africa and the Mediterranean basin . . .

11



. . . then the process of step (f) will take one or more sections of this pictorially represented image, divide them into smaller sections and request image data for each of those smaller sections . . .



. . .which can then be put together to form a higher resolution image that will look sharper on the screen (Appx0696):



This process is reiterated for each newly-divided section until one of the two termination conditions defined in step (g) is achieved, i.e., the "section has the desired image resolution or no higher image resolution data is available."  Like steps (a)-(e), steps (f) and (g) also aid in assuring that the application works within the memory and processing limits of the user's device, by requesting and processing only those data immediately needed to sharpen sections of the image to be displayed.

While developing TerraVision, ACI's inventors encountered another significant problem with handling the volume of data the application demanded. The machines they used had 32 bits for storing floating point numbers to address

all the coordinates of the world.  When you zoomed from outer space to view objects like buildings that are scaled in meters or less, you ran out of bits and "objects start to jiggle and dancing."  Appx0562.  ACI solved that problem by introducing a dynamic coordinate system for each frame, calculating the optimal position for the origin so that enough bits were available to render the scene. Appx0563-0564.  In other words, the coordinate system was shifted to accommodate the limited word length that all computers  have in managing data. That solution is captured in dependent claim 3:

> *The method of pictorial representation defined in claim 2, further including determining the data and/or the co-ordinates of the data in terms of a new coordinate system.*

C.    SIGGRAPH '95 and SRI TerraVision

ACI's inventors demonstrated their TerraVision system in several venues, including the International Telecommunication Media Gathering in Kyoto, a meeting of the G7 in Brussels and at SIGGRAPH conferences.  Appx0374-0375. Mr. Mayer described this as "a very rewarding experience" because "nobody had seen such a thing before anywhere."  Appx0375.

The jury heard quite a bit about the SIGGRAPH '95 conference, held in Los Angeles in August of that year.  The T_Vision Paper the jury found to anticipate claims 1, 14 and 28 came from CD-Roms distributed by the event's organizers, the Association for Computing Machines (ACM).  That paper was submitted to ACM

14

by one of ACI's inventors (Sauter) as a high-level, non-technical description of TerraVision, one that Mr. Mayer described as "marketing material." Appx0549. The evidence for this paper's publication through distribution of these CD-Roms is spotty at best.

Of the two inventors who testified, one (Mr. Mayer) could not recall whether CD-Roms containing this paper were distributed at the conference, and the other (Mr. Schmidt) affirmatively recalled they were not so distributed. Appx0375-0376, Appx0569. Google's evidence for "publication" came from: (1) an ACM official (Mr. Rous) who did not attend the conference and whose organization neither created the CD-Roms nor arranged for their shipment (Appx1153), and (2) Mr. Stephen Lau, a fact witness paid by Google at rates comparable to what the experts charged,[2] who claimed to recognize, twenty years after the fact, a CD-Rom that did not come from his files. Appx1200.

While attending SIGGRAPH '95, Mr. Lau demonstrated a system (also called TerraVision) being developed by him and others at SRI International. ACI's inventors observed this demonstration and were not impressed with what they saw. Mr. Mayer concluded ACI was "way ahead of what they were doing." Appx0407. And for good reason. As compared to ACI's TerraVision, video-captured at

---

[2]     Mr. Lau was paid at the same rate as Dr. Castleman ($450/hour), a rate slightly less than that charged by Google's technical expert, Dr. Goodchild. Appx0610, Appx1189-1190, Appx1314.

Appx5044, SRI's TerraVision, video-captured at Appx2565, is primitive. While ACI was working toward rendering the whole earth, SRI's ambitions for its system were far more limited, i.e., to thirty square kilometers of terrain around Ft. Irwin in California. Appx0481, Appx3272.[3]

D.    Google's Exposure To ACI's TerraVision System

ACI TerraVision was developed using (then) state of the art graphics work stations sold by Silicon Graphics (SGI), Appx0383, which are described in the '550 Patent specification. 6:45-56. ACI's inventors dealt directly with SGI personnel, including Michael Jones, who testified at trial. Appx0383. In the summer of 1995, they were invited to work on machines at SGI's demo center, where they showed their system to Mr. Jones. Appx0572-0573. Mr. Schmidt recalls Mr. Jones being "blow[] away" by what he saw. Appx0573. Mr. Jones recalled it was "one of my favorite demonstrations." Appx0492. SGI even asked ACI for a copy of TerraVision to show it to potential SGI customers. Appx0573.

Mr. Jones and other SGI personnel went on to form a company called Keyhole, which developed a product called Earth Viewer. Appx0851-0852, Appx1096-1098. Earth Viewer was released to the public in 2001, Appx0852, Appx1099, six years after ACI completed its invention. In 2004, Google acquired

---

[3]    By August of 1995, SRI TerraVision could display data for 30x40 kilometers of terrain around Fort Irwin. Appx1859.

Keyhole.  Appx1078-1079.  Earth Viewer was then "refined a little bit and then shipped as Google Earth."  Appx1079.

    E.    <u>Google's Dealings With ACI</u>

In 2006, Mr. Mayer reached out to Mr. Jones, hoping to strike a business deal with Google.  Appx0386-0388.  Attached to his email was a copy of U.S. Patent No. 6,100,897, the original patent corresponding to the '550 Patent, and a presentation regarding the same.  Appx0388.  Mr. Jones met with ACI in Berlin. Appx0391-0392.  While there, he expressed interest in the patent, not because he thought Google was practicing the claimed invention but to prevent others from doing so.  Appx0393.  Mr. Jones indicated there were two ways of doing things, the one described in the patent and the one employed by Google.  *Id*.  A Google attorney, Michelle Lee, would later describe this patent as a "nice to have" patent. Appx0396-0392, Appx3809.

To address prior art issues raised by Google, ACI applied for reissue, Appx0402-0403, which was granted in July of 2010.  Thereafter, Mr. Mayer approached Google again, Appx0408, who indicated they were no longer interested in licensing the patent.  Appx0413.  It was at this time that Mr. Mayer first considered the possibility that what Mr. Jones had told him was wrong, that Google was in fact infringing ACI's patent.  Appx0410-0411.  In February of

2013, a second reissue application was filed.  In October of 2013, the '550 Patent

issued.  ACI filed this lawsuit four months later.

F.    The Trial and ACI's Infringement Case

ACI asserted four claims (1, 3, 14 and 28) of the '550 Patent against three

classes of accused products.  Group I was Google Earth Version 8, which runs on

Android smartphones.  Appx0625-0626.  Group III was the new (as of February

2014) version of Google Maps, which has Google Earth built in.  Appx0626.

Group II encompassed all the other Google Earth products based on Earth Versions

7 and earlier, including enterprise versions and versions that run on Apple

smartphones and in Audi automobiles.  *Id*.  Google has never taken issue with this

grouping.

Going into trial, Google refused to concede that any claimed step or

limitation was found in any of its products, electing instead to press ACI to prove

its case.  So ACI did.  During its case-in-chief, and relying primarily on source

code from Google's products, ACI's expert provided detailed testimony aligning

each limitation of the asserted claims against corresponding structure/methodology

in all three accused product groups.  It was only after Dr. Castleman testified that

Google chose to focus the infringement dispute on steps (f) and (g).  Without

objection from Google, the jury was instructed that "Google does not dispute that

steps A through E of claim 1 are met.  Google also does not dispute that the

additional limitations of claims 3, 14 and 28 are met if the limitations of steps F and G are met." Appx1555.

In both the '550 Patent and in Google Earth, data are organized in a hierarchical tree structure, with each node of the hierarchy containing one image of the surface of the earth (Appx0639-0640):



The four red nodes at the bottom are "children" of the left-most blue node. In a process called "level of detail (LOD) culling," one goes down (or "traverses") the tree, looking for nodes and finding ones that contain images with the higher detail one wants displayed on the screen. Appx0697. Julien Mercay, a Google software engineer, confirmed that LOD culling is done at least in the Group III products (i.e., in Earth for Maps). Appx0514-0515. As Dr. Castleman testified, it is done in

all three accused product groups, and done in a way covered by steps (f) and (g). Of these three groups, the source code for Group III is most transparent.

Comments to a routine called Lodmanager.js state that it computes the list of nodes that match the required level of detail.  Appx0698.  Lodmanager searches down the data tree for nodes that contain high resolution images.  Appx0699. Using a variable called "target image quality," Lodmanager determines whether we've progressed as far as we need to go down the tree.  Appx0698-0699.  "[I]f you go to higher and higher resolution you'll eventually get to the point where you are displaying a full resolution that the display screen is capable of."  Appx0699. In the context of step (f), Lodmanager is the function that divides image sections lacking the desired image resolution into smaller sections.  Appx0700.  Another comment in Lodmanager states that it computes the set of nodes to render given the Lod (i.e., level of detail) criteria defined by the target image quality.  *Id*.

The Lodmanager.js source code also refers to a routine called BuildVisibleTree, which calls another routine named BuildVisibleTreeNode. Appx0701.  These routines isolate the branches of the tree on the server that contain the images that are visible to the camera and are needed to build the image to be displayed.  *Id*.

The Lodmanager.js source code also refers to routines called Recurse, isLeaf and EnqueuRequest.  isLeaf implements the second termination condition of step

(g), i.e., it indicates if "you've gone down the tree as far as you can go and there's no higher resolution data available." Appx0701-0702. EnqueuRequest makes the request for nodes that are needed from the network. Appx0702. A comment indicates that this routine recurses to children if needed. *Id*. In the context of step (f), EnqueuRequest is what requests higher resolution space related data for the smaller sections. *Id*. In the context of step (g), Recurse is what determines the termination conditions. *Id*. Dr. Castleman provided the jury with a similar analysis of the Group I source code (Appx0703-0708) and the Group III source code (Appx0708-0713).

Google's technical expert, Dr. Michael Goodchild, and its corporate representative, Peter Birch, conceded that source code is the ultimate authority as to infringement. Appx1069, Appx1224, Appx1226. However, using a demonstrative animation created for purposes of this lawsuit, both witnesses informed the jury that in certain instances -- the frequency of which was not explained -- the accused products will "skip" nodes via a "prioritization" process when traversing the data tree. Appx1046-1047, Appx1067-1068, Appx1235-1236, Appx1239-1240. Mr. Birch explained the "tradeoffs" to this approach. The benefit is having a final image sooner. The "tradeoff" is that while loading potentially high resolution data ahead of lower resolution data "there can be some discontinuities," for example half the screen may be sharp while the other half is

21

blurry.  Appx1049.  Without ever having requested claim construction on this point, Google's witnesses and lawyers told the jury that this "frame skipping" somehow distinguishes the accused products from the method defined in steps (f) and (g).

The shorthand Google's expert adopted for the process of step (f) was "coarse to fine" zooming or searching, which the court reporter at times transcribed as  "coarse defined."  Dr. Goodchild informed the jury that "[s]tep  F describes how  we  do  this  process  of  coarse-defined  (sic.,  "coarse  to  fine")  zoom." Appx1221-1222.  To avoid any doubt on this issue, Dr. Goodchild was pressed on cross-examination as to whether he equated step (f) with coarse to fine zooming. Consistent with his direct testimony, he confirmed both his characterization of "the process [of] step F as coarse-to-fine zooming" and his use of that characterization to  contrast  how  nodes  are  traversed  in  the  accused  Google  Earth  products. Appx1356.

Dr. Goodchild was asked by Google's counsel if he had "an example of source code for one group of the accused products that executes this prioritization process that leads out (sic., "leaves out") or skips some nodes?"  Appx1241-1242. In response, Dr. Goodchild showed the jury source code from Lodmanager.js, which was admitted as PTX 390.  *Id*.  As the comments plainly indicate, this source code not only executes coarse-to-fine zooming, but does so in *default*.

Appx1366-1368.    When shown these comments on cross-examination, Dr.

Goodchild's (and Google's) argument for noninfringement collapsed:

> Q.    And I believe we've established that course define (sic., "coarse
> to fine") is our shorthand for referring to the process of Step F of Claim 1?
>
> A.    Yes.
>
> Q.    So that the default operation of these products, the operation
> they are going to do unless something else happens is going to be course
> define (sic., "coarse to fine")?
>
> A.    I have no basis to answer your question.  I would need to
> consider this in great detail.  This is a very complex piece of code.
> Appx1368.

During closing argument, Google's counsel cited a SIGGRAPH 2014

presentation (PTX75; Appx4254) relating to Earth for Maps as support for

Google's argument that coarse-to-fine zooming is not implemented in its products.

Appx1637.    According to the slide cited from this presentation, the value,

this.okayImageryQuality, which implements coarse-to-fine zooming when it

defaults to zero, can also be set to one quarter of the "targetImageryQuality."

When that happens, according to the slide and as argued by Google's counsel,

Google Earth will skip nodes of less than quarter image quality. However,

according to this same presentation, this node-skipping mode of operation occurs

infrequently.

As one Google engineer, Janne Kontkanen, explained while presenting

PTX75 at SIGGRAPH 2014, Google Earth normally operates in one of two modes:

"navigation mode" and "deep load mode." Appx4588 at 20:17-20:55, Appx4289, Appx4291-4294. "Navigation mode," which Mr. Kontkanen described as the normal request order, is purely coarse to fine. Appx4588 at 18:18-18:57. It is only when Google Earth operates in "deep load mode," i.e., when a user rapidly zooms in deeply, that the quarter image quality criterion is applied. *Id*. at 19:11-20:06. At the end of this SIGGRAPH 2014 presentation, another Google engineer, Evan Parker, was asked how often "navigation mode" is used versus "deep load mode." *Id*. at 42:28-43:04. His response indicates that only ten percent of requests are in deep load mode and about ninety percent are in navigation mode, i.e., purely coarse to fine. *Id*.

## G.    The Trial and Google's Invalidity Case

Google's invalidity case rested on two foundations:  (1)  that the invention of claims 1, 14 and 28 was described in the T_Vision Paper submitted to ACM, a paper purportedly "published" in CD-Roms distributed at SIGGRAPH 95, and (2) that the invention of all asserted claims was placed in public use via SRI's TerraVision system, including its demonstration at SIGGRAPH '95.

### 1.    The T_Vision Paper

To convert the sketchy description of ACI's TerraVision system found in this "marketing material" into an anticipatory disclosure of its claimed invention, Google's expert resorted to imaginative interpretations of its content.

As noted above, step (b) of claim 1 requires "determining a field of view including an area of the object to be represented through a selection of a distance of the observer to the object and an angle of view of the observer to the object." Dr. Goodchild opined this process was disclosed by the T_Vision Paper's reference to a "performer side" of the application "know[ing] all viewing and flight parameters like position and direction," (Appx1705), and that from this it calculates the currently needed data.  Appx1349-1350.  Does this disclosure say anything about fields of view, observers and objects, or how angles and distances between the same might be used to determine a field of view?  On cross-examination, Dr. Goodchild conceded this language does not state in detail how the "currently needed data" are calculated.  Appx1349.  Nonetheless and according to Dr. Goodchild, "it would then follow that from the viewing parameters you would calculate the frustum and from that you would intersect it with the earth and calculate the currently needed data."  Appx1350.  This from a reference that neither mentions nor illustrates a frustum!  Dr. Goodchild then shed the following light on his anticipation "methodology":

> Q.    And you read all of that into the three lines of text that we have highlighted?
>
> A.    I believe that one of ordinary skill in the art as I defined it would have attached that meaning.

Q.    Okay.  Just so we're clear, what you have said, it's not in the text, it's something that you're reading into the text based on what you think a person of ordinary skill in the art would be?

A.    That's what I believe is the relevant criterion.  Appx1350.

In short, Dr. Goodchild did not testify about what the T_Vision Paper actually discloses.  Instead he opined as to what conclusions persons of ordinary skill might draw as to how the system described in that reference *might* be implemented.

He used the same, flawed methodology to opine that steps (f) and (g) are disclosed.  Specifically he asserted these steps could be found in a figure illustrating a square divided into sections and subsections, Appx1707, and in references (1)  to organizing data in a quadrant tree, and (2) to seamless links between different levels of detail which allow for continuous zooming. Appx1304-1305, Appx1703.  On cross-examination, Dr. Goodchild agreed that the cited figure "doesn't tell you whether sections are being subdivided based on whether or not a desired image resolution has been obtained," Appx1351, as step (f) requires.  As to whether this figure discloses "request[ing] higher resolution space-related data for the smaller sections," another requirement of step (f), he could state only that this would be understood "from the way the diagram has been draw."  *Id*.  Step (g), which requires that step (f) be repeated until certain termination conditions are satisfied, cannot possibly be disclosed in this figure

because, as Dr. Goodchild conceded, "[t]he boxes don't tell you when to stop dividing." Appx1352.

Dr. Goodchild made similar concessions about other text he highlighted. The T_Vision Paper's disclosure of "seamless links between different levels of detail" that allow for "continuous zooming" says nothing about dividing into smaller sections image sections that do not meet the desired image resolution. Indeed, the text Dr. Goodchild relied upon says nothing whatsoever about desired image resolutions. Appx1353. According to Dr. Goodchild, the reference "implies" this. *Id*. Because this text "doesn't tell you when to stop the process of dividing into smaller sections," Appx1354, it cannot possibly disclose the process of step (g). As to the T_Vision Paper's disclosure of organizing data into quadrant trees:

> Q.    That doesn't say anything about dividing sections of an image using desired image resolution as a criteria, does it?
>
> A.    It mentions a Quadtree which is clearly recognizable as a way of dividing the image into smaller sections with improved resolution.
>
> Q.    But simply for the fact that you use a Quadtree, that doesn't necessarily meaning (sic., "mean") that you're using desired image resolution as a criteria for the division, correct? There are other criteria you could use?
>
> A.    There are indeed. Appx1355.

Dr. Goodchild did not "interpret" the T_Vision Paper from the perspective of those of ordinary skill in the art. Instead, he used the ordinary skill in the art to

bridge gaps between what was disclosed in this "marketing material" and what was claimed in the '550 Patent. In the course of doing so, Dr. Goodchild repeatedly suggested to the jury that the T_Vision Paper discloses methods not described in its four corners.

### 2.    SRI TerraVision

The factual predicate for Google's defense was laid by Mr. Lau, who wrote most of the source code for SRI TerraVision. Appx1158. Even though Lau had reviewed in some detail the '550 Patent, Appx1189, and was presumably familiar with the invention it claims, Google elicited no testimony from him comparing that invention to anything SRI had placed in public use. Google took a very different approach to proving this defense.

Mr. Lau claimed to have publicly-demonstrated SRI Terravision on at least two occasions, at the SIGGRAPH 95 conference and at the 1994 Magic Technical Symposium.[4] Appx1175. His claim to have attended the latter proceeding is dubious at best. In 2006 and in testimony provided in a different lawsuit, Mr. Lau affirmatively recalled NOT having attended that symposium because he was on personal leave. Appx1196-1197. On redirect, Mr. Lau "explained" the discrepancy between his prior and current testimony, citing recently-discovered

---

[4]    The MAGIC Project was a DARPA-funded effort to develop high-speed, wide area networks.

travel receipts, Appx1203, which were not brought to trial and to this day have not been produced.

Mr. Lau provided little (if any) testimony as to what specifically was demonstrated either at the 1994 Magic Symposium or at SIGGRAPH 95, what specific method steps attendees would have seen performed. Instead, he sponsored a "really, really grainy" video purporting to illustrate how TerraVision worked. DTX1088 (Appx2565); Appx1160-1161. Then he was shown five documents created during this system's development, none of which described in concrete terms either of the demonstrations Google claimed were public uses:

- DTX1087 (Appx2122, *et seq.*) a 443-page document titled "1994 Magic Technical Symposium" (Appx1165-1166)

- DTX1023 (Appx1758, *et seq.*), an SRI Technical Note relating to TerraVision created in April of 1994 (Appx1168-1169)

- DTX1193 (Appx3258, *et seq.*), an overview of the Magic Project created in December of 1993 (Appx1169-1170)

- DTX1036 (Appx1778, *et seq.*), a 200-page document titled "1995 Magic Technical Symposium" (Appx1171-1172)

- DTX1037 (Appx1979, *et seq.*), an April, 1994 SRI Technical Note relating to Tile Set Definitions in TerraVision (Appx1173)

As to the alleged public use of SRI TerraVision at SIGGRAPH 95, Mr. Lau offered the following testimony:

> Q. And how did that demonstration of the TerraVision system compare to the features that were shown in the video?

29

A.    They were the same features that were shown on the video with TerraVision.

Q.    And how do the features of the version of TerraVision that you've demonstrated compare to the features described in the documents that we walked through?

A.    The features of TerraVision that was demonstrated at SIGGRAPH 1995 were the same that was, that was in the papers that had been published to date, including the ones that we have talked about. Appx1176-1177.

He was asked substantially the same questions, and provided substantially the same answers, regarding the 1994 Magic Symposium.  Appx1186.  At no point was he asked to identify a specific "feature," or even a specific document describing the same, or to link that document or "feature" to what was specifically demonstrated, either at the 1994 Magic Symposium or at SIGGRAPH 95.  Instead, Google had its expert cherry-pick these five documents to recreate the system allegedly demonstrated at these events, neither of which he attended.

While parsing these documents for disclosure favorable to Google's case, Dr. Goodchild systematically ignored disclosure distinguishing SRI's TerraVision system from the claimed invention.  DTX 1193, which Dr. Goodchild relied upon for his understanding of what TerraVision did, Appx1327-1328, describes the supporting database system as "co-located" at the U.S. Geological Survey facility in Sioux Falls, South Dakota.  Appx1327, Appx3266.  This disclosure cannot be of the claimed "plurality of spatially distributed data sources" because -- contrary to

30

the district court's construction of step(a) -- those data sources are not geographically separate.  In addition, according to DTX1023 which Mr. Lau co-authored, the data requested from those data sources are not limited to "data for the field of view," as required by step (c) of claim 1.  Instead, terrain data are pre-fetched before they are actually required for rendering because of inherent delays in retrieval from the database:

> Because of inherent delays in retrieving tiles, Terra Vision requests tiles well in advance of their being visible by *predicting the user's future viewpoint*, expanding this viewpoint to take into account the uncertainty in the prediction, and *requesting those tiles in the future viewpoint* that are not currently in memory. Appx1760 (emphasis supplied).

While ignoring this disclosure, Dr. Goodchild cited other disclosures that do not prove what Google claims.  According to Dr. Goodchild, steps (b) and (c) of claim 1 were practiced by SRI TerraVision because DTX1023 refers to "incremental retrieval of the database."  Appx1266-1267, Appx1760.  But as Dr. Goodchild conceded on cross-examination, this document does not "state what increment is being used to retrieve the data, whether it's been done in increments of field of view or some other type of increment".  Appx1332.  Neither did any of the other language Dr. Goodchild highlighted for the jury.  When pressed on this point Dr. Goodchild opined that "if there are differences that are perceived between the claims of the patent and the description of the TerraVision system, then I believe those differences would have been obvious to one of ordinary skill in

the art." Appx1332-1333. ACI submits that if "there are differences that are perceived between the claims of the patent and the . . . TerraVision system," then that system was not a public use of its invention.

As to steps (f) and (g) of claim 1, Dr. Goodchild's analysis of TerraVision went even farther astray. He highlighted language from DTX1023 describing coarse to fine searching on a quadrant tree and "representing this until we found a portion of the terrain that was of interest." Appx1270, Appx1760. However, this language, "repeating this until he/she has found the portion of the terrain that is of interest," comes after the phrase "rather than" and as such is a description of what TerraVision *didn't* do. Appx1336-1337. When confronted with this disconnect between the substance of his testimony and what DTX1023 actually says, Dr. Goodchild conceded "[t]his is not very clear syntax." Appx1338.

As hard as Dr. Goodchild worked to cobble together claim 1's invention from these TerraVision documents, when he got to claim 3, he really outdid himself. As to claim 2, from which claim 3 depends, he cited language in DTX1023 purporting to show that TerraVision allowed users to "roam around the terrain" and from DTX1087 purporting to describe "the ability to pan and zoom over the terrain imagery." Appx1272-1273. While this language may disclose "altering the selectable location" it does not disclose what is required by the rest of claim 2, i.e., "performing the steps (b) through (g)" once that location is altered.

As to claim 3 itself, Dr. Goodchild opined that DTX1037 disclosed "the transformation that's necessary as it is in any computer graphic system from the 3D coordinate to the 2D coordinate system of the screen."  Appx1273.  But this "transformation" -- from the 3D coordinates navigated in the system to the 2D coordinates to be rendered on the screen -- is not the coordinate transformation defined in claim 3, which requires the use of a "new" coordinate system.  The 2D screen coordinate system is not *new* because it's already used in *every single frame*.  The coordinate transformation of claim 3 comes in response to a change in the selectable location, not as part of the routine process for rendering a 3D image on a 2D screen.

H.    Post-Trial Motions

After trial, ACI moved for judgment as a matter of law on all issues the jury decided.  ACI's motion also sought judgment as a matter of law on the obviousness defenses not decided by the jury, i.e., those submitted in Questions Nos. 4 and 7. That motion was denied on September 9, 21016.

# SUMMARY OF THE ARGUMENT

After having been caught infringing a valid patent, Google put together a trial defense calculated to steer the jury away from the invention claimed in that patent, into territory irrelevant either to that patent's validity or to its infringement by Google.

Per Google, the accused Earth products avoid infringing the '550 Patent by skipping frames in a prioritization process that yields image discontinuities. This process, which is *not* Earth's default mode of operation and in fact is at most practiced only 10% of the time, is also extraneous to the scope of claim 1. Steps (f) and (g) of that claim, the only limitations in dispute, relate entirely to data for one or more sections that have already been pictorially represented, i.e., in accordance with step (e). Data not represented because frames are "skipped" are entirely outside this claim, which is prefaced with open-ended "comprising" language.

When testifying in support of Google's invalidity defenses, Google's expert also paid lip service to the claims. His opinions that claims 1, 14 and 24 are anticipated by the T_Vision Paper go well beyond what that reference actually provides within its four corners. As to steps (b) and (c) of claim 1, Dr. Goodchild testified not to what the reference discloses, but to what he believes would "follow" from that disclosure. As to step (f), his opinion looked to what the reference "implied." As to step (g), which defines the termination conditions for the division process of step (f), he readily admitted that the reference did not "tell you when to stop dividing."

The claims likewise played a minor role in Google's public use defense. Mr. Lau, the only witness having first-hand knowledge of either alleged public

demonstration of SRI TerraVision, did not attempt to align what was used publicly against what the '550 Patent claims.  Nor did he testify in sufficient detail to allow someone else to make that comparison.  Instead, after having sponsored a video and five documents relating to TerraVision, he told the jury they could find what was used publicly somewhere in these exhibits.  But not one of those documents was written to describe in concrete terms either of the individual alleged public uses (i.e., what was demonstrated to whom and where on a particular date).  With this "foundation" having been laid by Mr. Lau, Google's expert proceeded to cherry-pick these documents to recreate these two alleged public uses of SRI's TerraVision system.  In the course of doing so, he ignored disclosure pointing away from the claimed invention, and as he did with the T_Vision Paper, twisted and supplemented other disclosure, thereby arriving at a conclusion that SRI TerraVision -- which Google did not attempt to prove was ready for patenting, as the law requires -- placed in public use the invention of the asserted claims.  Nor did Google attempt to prove, again as the law requires, that the invention would have been ascertainable to observers of these alleged public use demonstrations.

Google's obviousness defenses -- whether decided by the jury (Question No. 8) or not (Questions Nos. 4 and 7) -- are likewise unsupported by substantial evidence.  For most of those defenses, Google's expert offered only a bare conclusion that whatever limitations were not disclosed in the T_Vision Paper or

practiced in SRI TerraVision, would have been obvious to those of ordinary skill. In his one attempt to combine references, i.e., when opining that claim 3 is obvious based on the disclosures of the T_Vision Paper and the Global Mapping patent, Dr. Goodchild laid out what he thought was the relevant legal standard then failed to apply it.

Should this Court remand this matter for a trial on damages, it should also vacate the district court's summary judgment that Google did not infringe willfully. That judgment was based entirely on the "objective prong" of *Seagate* and the reasonability of Google's trial defenses, reasoning the Supreme Court would go on to discredit, six weeks later, in *Halo Electronics*.

## ARGUMENT

Following a trial in which Google repeatedly distracted it from the four corners of the '550 Patent claims, the jury returned verdicts on infringement and invalidity that were not supported by substantial evidence. The district court erred in denying ACI judgment as a matter of law on these issues. That court also erred in denying ACI judgment as a matter of law on the obviousness defenses stated in the two questions the jury did not answer. This Court should reverse the district court's decision on ACI's Rule 50(b) motion and remand for a trial on damages. That trial should also address the willfulness of Google's infringement, as the district court granted summary judgment on this issue based on the objective

reasonability of Google's defenses. In light of *Halo Electronics*, Google's objective reasonability is merely *a* factor potentially relevant to willfulness, not a *dispositive* factor, as the district court treated it.

## I.    STANDARD OF REVIEW

Fed. R. Civ. P 50(b), like Fed. R. Civ. P 50(a), authorizes a district court to enter judgment against a party on an issue when "a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue." This Court reviews a district court's denial of JMOL be reapplying the JMOL standard. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (*en banc*), *aff'd*, 116 S.Ct. 1384 (1996). When reviewing a district court's grant of summary judgment, this Court "make[s] an independent determination as to whether the standards for summary judgment have been met." *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). Viewing the evidence in a light most favorable to the non-movant, this Court draws all reasonable inferences in its favor. *Id.* "Summary judgment is appropriate when no reasonable jury could return a verdict for the non-moving party." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

## II.    GOOGLE INFRINGED THE '550 PATENT

Google secured a verdict of noninfringement by directing the jury to a process ("node-skipping") that is extraneous to the asserted claims and performed infrequently in the accused products.

### A.    "Node-Skipping" is Irrelevant to Claim 1

Claim 1 of the '550 Patent is an open-ended "comprising" claim, which means that -- and the jury was so instructed -- the claim is not *limited* to the steps that follow the preamble.  Appx1551.  Google does not avoid infringement by performing additional steps if the steps it does perform come within the claim's four corners.  At no point in these proceedings did Google request the district court to construe step (f) to require that *all* available higher resolution image data be rendered and displayed to the user such that "skipping" nodes containing such data would avoid infringement.  And for good reason, because the claim cannot be read that way.

In step (e) of claim 1, "data for the field of view" are represented "in a pictorial representation having one or more sections."  This is done, e.g., when the user sees the first frame presented following a shift in view.  In step (f), "each of the one or more sections having image resolutions below a desired image resolution" are divided into a "plurality of smaller sections" and higher resolution space-related data are requested "for each of the smaller sections."  In context, the

"one or more sections" divided per step (f) are the "one or more sections" of the "pictorial representation" provided in step (e).  On its face, step (f) is referring back to the one or more sections pictorially represented pursuant to step (e), and then dividing "one or more" of those sections for the purpose of requesting higher resolution data for the one or more of those sections for which higher resolution data might be available.

Step (f) then  requests the "higher resolution space related data" for building the second frame.  Step (f) goes on to state that this data is centrally stored and represented in a pictorial representation, thereby enabling display of the second (and sharper) frame.  To get to the third (and even sharper) frame, we "repeat step(f)" as provided in step (g).  Once again, "each of the one or more sections having image resolutions below a desired image resolution" are divided into a "plurality of smaller sections" and higher resolution space-related data are requested "for each of the smaller sections."  In context, the "one or more sections" divided per step (f) are now sections of the "pictorial representation" used to build the second frame.

By its plain terms, step(f) (as repeated per step(g)) relates entirely to data pictorially represented first via step (e) and then through the iterative process of steps (f) and (g).  Data not represented because the corresponding nodes are

"skipped" are entirely outside this claim.  By way of example, if the application "skips" the blue nodes illustrated below . . .



. . . the claimed method is carried out once data from the red nodes are rendered.

Google has offered no coherent argument for the relevance of "node-skipping" under a proper reading of claim 1.  To accept Google's noninfringement position, one would have to read step (g) such that the "one or more sections" of repeated step (f) no longer reference sections of a represented image like the one represented per step (e).  Instead, this language would suddenly shift to reference any "smaller sections" the application may have subdivided,  Such a position is both nonsensical (why repeat step (f) on data that won't be displayed?) and counter to the full text of step (f), which requires that higher-resolution data for "smaller

sections" be requested from spatially distributed data sources, centrally stored and represented as "data for the field of view in the pictorial representation."

B.    "Node Skipping" is of Little Relevance to the Accused Products

When Dr. Goodchild showed the jury source code from Lodmanager.js, it was represented to be "an example of source code for one group of the accused products that executes this prioritization process."  Appx1241-1242.  Presumably, Dr. Goodchild (and Google) intended that the jury treat Lodmanager.js as "an example of source code . . . that executes this prioritization process" in all three groups of products, as no other source code was identified with this process.  Once this source code is accepted as fairly representative of the "prioritization process" in all accused products, it is clear that none of them, in fact, prioritize on a regular basis.  "Coarse to fine zooming," a process Dr. Goodchild identified with step (f) of claim one, a process he tried to contrast with the "prioritization" scheme in Google Earth, is the default process for Lodmanager.js.  For nodes to be "skipped," the this.okayImageryQuality parameter of Lodmanager.js must be reset from its default value.  As Google's Evan Parker indicated when presenting Earth for Maps to SIGGRAPH 2014, this only happens ten percent of the time.[5]  If "an accused

---

[5]    We do not need Mr. Parker to confirm that nodes are seldom skipped in these products.  The artifacts Mr. Birch attributes to node-skipping, the split screens with sharp and blurry halves, are not commonly encountered in the accused products, which is why Dr. Castleman concluded "Google Earth doesn't work that way."  Appx1494.

product that sometimes, but not always, embodies a claimed method nonetheless infringes," *Bell Communications, Inc. v. Vitalink Communications Corp*., 55 F.3d 615, 622-23 (Fed. Cir. 1995), then Google Earth, which embodies the method of claim 1 (even as improperly construed by Google) *ninety percent of the time*, must also infringe.

## III.   THE '550 PATENT WAS NOT PROVEN INVALID

Google's invalidity case was an exercise in "fitting" its alleged prior art (e.g., the round peg) into the asserted claims (e.g., the square hole that would not hold it).   Had the jury held that art up against the four corners of the asserted claims, it would have never found them invalid.

### A.   Google Has No Obvious Case Against Claims 1, 14 and 28

As to whether claim 1 was obvious in light of the T_Vision Paper, Dr. Goodchild testified that:

> Q.   And we talked about the second of the legal rules, that is Section 103A.   Have you reached a conclusion as to whether or not disclosures in the T_Vision publication render obvious the Claim 1 of the '550 Patent?
>
> A.   Yes, I have.   And once again, if there are differences between the precise language of the claims and the precise language of the sections of the publication that I've cited, then I believe it's obvious that one of ordinary skill in the art would have seen no important different between them. Appx1306.

42

He provided a similar conclusion regarding the obviousness of claims 14 and 28. Appx1308. As to the obviousness of all asserted claims in light of SRI TerraVision, he testified that:

> Q. Based upon your review and the analysis of the '550 patent, what have you concluded with respect to whether or not the SRI TerraVision system anticipates the claims of the -- the asserted claims of the '550 patent under Section 102 that we looked at?
>
> A. I have concluded that in my opinion the TerraVision system anticipates the asserted claims. But I also have allowed the differences are perceived between the asserted claims and the TerraVision system that those differences would have been obvious to one of ordinary skill in the art at the time. And so in effect, there is a combination of an anticipation case and an obviousness case. Appx1276-1277.

Dr. Goodchild was wrong. As to claims 1, 14 and 28 Google has no validity defense other than anticipation. Dr. Goodchild's unexplained and unreasoned conclusions are not "clear and convincing" proof of obviousness. *See ActiveVideo Networks, Inc. v. Verizon Comm'n, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir.2012) ("[T]he expert's testimony on obviousness was essentially a conclusory statement . . . "). *See also Upjohn Co. v. Mova Pharmaceutical Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 200). Dr. Goodchild did not identify particular differences between the asserted claims and the alleged prior art; nor did he address any of the *Graham* factors. Instead, he simply asserted that if there were differences, they would have been obvious. This conclusory testimony falls well shy of the clear and convincing evidence needed to invalidate a patent claim for obviousness.

B.     The T_Vision Paper Does Not Anticipate Any Asserted Claim

Anticipation under Section 102 of the patent statute can be found only if a reference shows exactly what is claimed. *Titanium Metals, Inc. v. Banner*, 779 F.2d 775, 780 (Fed. Cir. 1985). This is a rigorous defense, and an expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself. *Motorola, Inc. v. Interdigital Technology Corp*., 121 F.3d 1461, 1473 (Fed. Cir. 1997).[6] *See also Jamesbury Corp. v. Litton Indus. Prods., Inc*., 756 F.2d 1556, 1563 (Fed. Cir. 1995) (granting JNOV of validity where the record as a whole, including the apparent content of the prior art reference, did not support an expert's conclusory testimony of anticipation); *W.L. Gore & Assocs., Inc. v. Garlock, Inc*., 721 F.2d 1540, 1554 (Fed. Cir. 1983) (reversing trial court's judgment of invalidity because expert's testimony of inherent anticipation, unsupported by the evidentiary record, cannot serve as a basis for finding anticipation). Google must prove this defense with clear and convincing evidence. *Typewright Keyboard Corp. v. Microsoft Corp*., 374 F.3d 1151, 1157-58 (Fed. Cir. 2004).

---

[6]     As to one of ITC's asserted patents, the district court had erroneously concluded that the jury was entitled to credit the testimony of Motorola's expert supporting its defense of anticipation. In reversing that decision, this Court noted that "[w]ithout any disclosure of the four particular synchronization functions in the Kinoshita (1981 Japan) prior art reference, the jury's anticipation verdict cannot stand." *Motorola*, 121 F.3d at 1473.

The T_Vision Paper does not come close to disclosing the invention of claim 1 (and thus of claims 14 and 28) of the '550 Patent. The yawning gaps between what that paper teaches and what the patent claims are best illustrated by aligning the language of claim 1 against what Google's expert asserts to be the reference's corresponding disclosure:

| Claim 1 | The T_Vision Paper (DTX1001A) |
|---|---|
| (b) determining a field of view including an area of the object to be represented through a selection of a distance of the observer to the object and an angle of view of the observer to the object | "On the Performer side it knows all viewing and flight parameters like position and direction. From that it calculates the currently needed data and predicts the needed data for future flightpath." |
| (f) using a computer, dividing each of the one or more sections having image resolutions below a desired image resolution into a plurality of smaller sections, requesting higher resolution space-related data for each of the smaller sections from at least one of the plurality of spatially distributed data sources, centrally storing the higher resolution space-related data, and representing the data for the field of view in the pictorial representation | "Terravision specific concept of seamless links between different levels of detail allows the continuous zooming from a global view down to recognizable features of only a few centimeters in size."<br><br>"The data base is organized as a quadtree, containing higher levels of detail as you descend down the tree." |

| | |
|---|---|
| |  |
| (g) repeating step (f), dividing the sections into smaller sections, until every section has the desired image resolution or no higher image resolution data is available | same as for step (f) |

As to step (b), neither the selected disclosure nor the reference in general mentions fields of view, observers and objects, or how angles and distances between the same might be used to determine a field of view. According to Dr. Goodchild, this is something that would "follow" from the actual disclosure. Appx1350. As to step (f), neither the selected disclosure nor the reference in general describe using level of detail as a criterion for subdividing image segments or the request/storage/representation of higher resolution image data. According to Dr. Goodchild, this is "implied" in the reference. Appx1353. Even Dr. Goodchild concedes that no termination conditions are disclosed, either in the subdivided box figure or in the text he chose to cite, neither of which "tell you when to stop dividing." Appx1352, Appx1354. With *no* termination conditions disclosed in the

T_Vision Paper, that reference cannot possibly disclose the *two* termination conditions defined in step (g).

Google's expert did not *equate* the T_Vision paper's disclosure with the claimed invention. At best, he proposed that one way of doing what's described in this "marketing material" is through the method of claim 1. This testimony falls well short of the rigorous, clear and convincing proof needed to show that this reference anticipates.

C.    SRI TerraVision Was Not a Public Use of Any Asserted Claim

Google's claim that SRI TerraVision placed the invention of the asserted claims in public use is one that must be proven with clear and convincing evidence. *Moleculon Research v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed. Cir. 1986). The usual approach to proving a prior public use of a patented invention is through fact witnesses percipient to that use, who testify in detail as to what was used publicly, typically by comparing those details to what's defined in the patent claims of interest. *See Zenith Electronics Corp. v. PDI Communication Systems, Inc.*, 522 F.3d 1348, 1357-58 (Fed. Cir. 2008); *Adenta, GmbH v. Orthoarm, Inc.*, 501 F.3d 1364, 1370 (Fed. Cir. 2007). Where those fact witnesses have an interest in the dispute, e.g., because they are being paid at inflated rates for their services, that testimony must be corroborated to meet the clear and convincing evidence

standard. *See Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1366-68 (Fed. Cir. 1999).

In the case of Mr. Lau, there was scant testimony to corroborate. He provided little detail as to what observers of SRI TerraVision would have seen, either at the 1994 Magic Symposium or SIGGRAPH 95. Though he claimed to having studied the '550 Patent in some detail, Lau did not identify SRI TerraVision with a single step of the asserted claims. Google turned instead to Dr. Goodchild for this comparison, who attended neither conference, had no knowledge as to what (if anything) was demonstrated at them, who relied entirely on Lau to lay a foundation for his analysis.

What was that foundation? As to the SIGGRAPH '95 demonstration, it was Lau's assertion that features demonstrated there "were the same that was, that was in the papers that had been published to date, including the ones that we have talked about." Appx1176-1177. As to the 1994 Magic Symposium demonstration, it was his equally vague assertion that "the features . . . was equivalent to all the papers thanked been published to date." Appx1186. That testimony came after Lau had sponsored five different documents (DTXs 1023, 1036, 1037, 1087 and 1193) purporting to describe the TerraVision system, none of which were specifically identified as a "paper" pertinent to that system as demonstrated either at the 1994 Magic Symposium or at SIGGRAPH '95. Collectively, these

documents are hundreds of pages long, and Lau did not point the jury to a single one of those pages as describing a "feature" demonstrated at a specific place or time.  They describe research being conducted by SRI, including various pros and cons of that research discovered over time, but they do not describe in any way either of the two individual alleged public uses cited by Google as prior art.

This Court has allowed accused infringers to rely on product data sheets, *see Zenith Electronics.*, 522 F.3d at 1357-58, and product drawings, *see Adenta*, 501 F.3d at 1367, to corroborate testimony as to what was placed in public use.  But that's not what Google did here.  Lau did not state in any detail what was demonstrated at the 1994 Magic Symposium or at SIGGRAPH '95.  There is no testimony to "corroborate."  Instead, Lau sponsored five exhibits and told the jury that TerraVision as demonstrated could be found somewhere in these papers, thereby green-lighting Dr. Goodchild to cherry-pick selected excerpts to stitch together the claimed invention.

In any event, these papers are in no way comparable to the data sheets of *Zenith Electronics* or the drawings of *Adenta*.  SRI TerraVision was not a finished product.  It was a system in development.  Its "features" were in flux.  The documents Lau claims to describe those "features" even point away from the claimed invention.  DTX1093 describes a database system co-located in Sioux Falls, South Dakota, a system that cannot be the claimed "plurality of spatially

distributed data sources" because it is geographically contiguous.    DTX1023 proposes that terrain data exceeding the field of view be requested and fetched to predict the user's future viewpoint.[7]    That process lies well outside steps (b)-(d) of claim 1.    Instead of the dynamic coordinate system defined in claim 3, DTX 1087 (at Appx2159) proposes using a single world coordinate system.    Because SRI TerraVision was not a finished product, because documents purporting to describe it affirmatively point away from the claimed invention, it was absolutely essential that Lau (or some other witness percipient to the system's use) specifically point out which "features" in which documents were used publicly.    The jury heard no such testimony.    Its verdict that SRI TerraVision placed the asserted claims in public use is not supported by substantial evidence.

### 1.    Dr. Goodchild's Testimony Lacks Foundation

Instead of having Mr. Lau identify the 1994 Magic Symposium and SIGGRAPH '95 uses with ACI's invention, Google turned to Dr. Goodchild, who does not claim to have observed either demonstration.    Lacking first-hand knowledge of these alleged public uses, Dr. Goodchild in effect fabricated them by cherry-picking the documents Mr. Lau sponsored.    He cited DTX1023 as support for his opinion that "the SRI TerraVision system disclose[s] Steps B and C of the

---

[7]    Other references to fetching data for the user's predicted future viewpoint can be found in DTX 1087 (Appx2163, Appx2167, Appx2309) and DTX1036 (Appx1865).

'550 Patent."    Appx1266-1267, Appx1269.    He cited the same document as

support for his opinion "that the TerraVision system disclosed Steps F and G of

claim 1."    Appx1270.    His opinions regarding claim 3 were based on disclosure

culled from DTXs 1023, 1087 and 1037.    Appx1272-1273.

Dr. Goodchild's opinions are purely speculative.    Mr. Lau never claimed

that DTX1023 generally or the passages cited by Dr. Goodchild describe how data

were defined and requested in any public use of SRI TerraVision.    Mr. Lau did not

testify that DTX1023 generally or the passages cited by Dr. Goodchild describe

how images were progressively sharpened (if at all) in any public use of SRI

TerraVision.    Mr. Lau did not testify that any of DTXs 1023, 1087 or 1037

describe how coordinates were shifted (if at all) in any public use of the system.

Instead, Mr. Lau sponsored a stack of "papers" as pertaining generally to SRI

TerraVision, and Dr. Goodchild combed those papers for disclosure he could parse

into the claimed invention.

This was not a public use analysis.    It was, in effect, an obviousness analysis

-- and an incompetent obviousness analysis -- based on documents Google did not

attempt to prove as published prior art.

> 2.    No Evidence for the Practice of Steps (b), (c), (f) and (g)

Even as stitched together by Dr. Goodchild, the documents sponsored by

Mr. Lau do not suggest that any of steps (b), (c), (f) and (g) were practiced in SRI

TerraVision.  Step (b), which is very specific in defining what data the application will request in step (c), bears re-quoting:

> *(b) determining a field of view including an area to the object to be represented through a selection of a distance of the observer to the object and an angle of view of the observer to the object;*

Dr. Goodchild "found" this step in DTX1023's bare reference to "incremental retrieval of the database," Appx1266-1267, a reference he concedes does not "state what increment is being used to retrieve the data, whether it's been done in increments of field of view or some other type of increment."  Appx1332.  To glean steps (f) and (g) from the same reference, and in a creative take on the English language, Dr. Goodchild read the highlighted text in the following . . .

> Terravision basically uses an incremental retrieval of the data base as required by the user, *rather than* forcing the user to copy a part of the database to local storage, visualizing that part, and *repeating this until he/she has found the portion of the terrain that was of interest* . . . Appx1760(emphasis supplied)

. . . as describing what TerraVision actually did, even though the "rather than" text plainly indicates that the "repeating this . . . interest" text defines something TerraVision did not do.

The jury heard no evidence, much less substantial evidence, that any of steps (b), (c), (f) or (g) were implemented in SRI TerraVision, as demonstrated either at the 1994 Magic Symposium or at SIGGRAPH '95.

3.    No Evidence for the Practice of Claim 3

Dr. Goodchild's opinion that claim 3 was practiced in SRI TerraVision is based on a reference in DTX1037 -- again, a document Lau did not specifically identify with either alleged public use of the system -- to "the transformation that's necessary as it is in any computer graphic system from the 3D coordinate to the 2D coordinate system of the screen."  Appx1273.  But these routine transformations, performed whenever 3D objects are rendered on 2D screens, are not the ones defined by claim 3.  The *claimed* coordinate transformation is one that follows -- per claim 2 from which claim 3 depends -- a change in the selectable location, such that the data and co-ordinates of the data are determined in terms of new co-ordinates.  As explained in the specification:

> As this accuracy in the present example is insufficient for example to follow a movement of an observer from space continuously down to a centimeter resolution on the earth, the co-ordinates of the data during such a movement were continuously converted to a new co-ordinate system with a coordinate origin located in the vicinity of the observer. (6:50-56).

Because claim 3 does not address (much less define) the sort of coordinate transformation Goodchild "found" in SRI TerraVision, the jury's verdict that claim 3 was placed in public use by that system is unsupported by substantial evidence.

4.    No Evidence the Invention Was Discernable in SRI
      TerraVision

Google did not attempt to prove that the public could actually discern the

patented invention in SRI TerraVision.   At most, Google tried to prove the

invention was "discernable" in cherry-picked excerpts from documents purporting

to describe the system.   This failure of proof is fatal to its defense.

In *Dey, L.P. v. Sunovion Pharmaceuticals, Inc.*, 715 F.3d 1351, 1355-57

(Fed. Cir. 2013), this Court vacated a summary judgment holding that clinical trials

of the accused product (a drug for treating lung disease) had placed the claimed

invention in public use.   Although investigators conducting these trials had signed

confidentiality agreements, the participants had not.   The district court's judgment

that these trials had placed the claimed invention (directed to formulations of these

drugs) in public use focused on those participants.   In vacating that judgment, this

Court found that "a reasonable jury could conclude that if members of the public

are not informed of, and cannot readily discern, the claimed features of the

invention in the allegedly invalidating prior art, the public has not been put in

possession of those features."  *Dey*, 715 F.3d at 1359.   That finding was premised

on the recognition that "a secret third-party use is not invalidating." *Id*.

Similarly, in *Delano Farms Co. v. California Table Grape Comm'n*, 778

F.3d 1243, 1249-50 (Fed. Cir. 2015), this Court found no public use of patented

plants where "grape varieties cannot be reliably identified simply by viewing the

growing vines alone." The Court distinguished the so-called "corset case," *Egbert v. Lippmann*, 104 U.S. 333 (1881), as one involving a public use authorized by the inventor. *Id.*, at 1249. This distinction -- consistent with *Dey's* recognition that "a secret third party use is not invalidating" -- is also consistent with *Egbert*. The Supreme Court found an invalidating public use based on the patentee's "abandonment" and "dedication to the public" of the patented invention. 104 U.S. at 337. Where, as in this case, *Dey* and *Delano Farms*, the alleged public use was not authorized by the patentee, the abandonment rationale does not apply and the use must actually place the invention in the public's hands.

Google offered no evidence that SRI Terravision did this, as demonstrated either at the 1994 Magic Symposium or at SIGGRAPH '95. The jury heard no evidence, much less substantial evidence, that the *claimed invention* was in any way discernable to those who attended these events. Judgment as a matter of law should have been entered on this basis alone. Nonetheless, should this Court find a triable issue of fact on the current record, then a new trial of Google's public use defense is warranted. ACI requested and was denied an instruction, based on *Dey*, that the claimed invention must be discernable to the public from a purported public use. Appx1508. In a trial where Google did not treat this as an element of its defense, the district court's failure to give that instruction was unquestionably prejudicial.

5.    No Evidence SRI TerraVision was Ready for Patenting

In *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 60 (1998), the Supreme Court interpreted the word "invention" in 35 U.S.C. § 102(b) as one that is complete and ready for patenting.   Although *Pfaff* involved an "on sale" bar, the same word, "invention," defines the public use bar.   As a result, this Court has held that "the Supreme Court's 'ready for patenting test' applies to the public use bar under § 102(b)."   *Invitrogen Corp. v. Biocrest Manufacturing, L.P.*, 424 F.3d 1374, 1379 (Fed. Cir. 2005).   The jury heard no evidence that SRI TerraVision was ready for patenting.

Neither Dr. Goodchild nor Mr. Lau said anything about the development goals or performance criteria targeted by SRI, about metrics evaluated through testing of the system, or about when the system was considered complete.   No evidence was presented, for example, of who determined TerraVision was ready for patenting or how it was decided that the system was in any way complete and usable for its intended purpose.   Google treated "ready for patenting" in exactly the same way it treated "public discernibility" -- i.e., as if it *weren't* a material element of its defense.

The pertinent evidence adduced at trial shows that TerraVision was not ready for patenting, that the system was nothing more than a work in progress. DTX 1193, one of the five papers Mr. Lau claimed to disclose "features" of the

system, lists four challenges that must be addressed before the benefits of a gigabit WAN could be realized, Appx3264, yet neither Dr. Goodchild nor anyone else provided an analysis of which (if any) of those challenges were addressed and when. Appx1329-1330. This paper goes on to identify multiple "research issues," including the development of terrain visualization software and architecture for a high speed scalable parallel distributed storage system. Appx3268-3269. Dr. Goodchild did not determine whether any of these "research issues" were addressed by the TerraVision developers prior to the system's alleged public use. Appx1330-1331.

Two of SRI TerraVision's developers, Mr. Lau and Dr. Leclerc, actually discussed the possibility of patenting the system. They concluded "it was not innovative enough to be a patent." Appx1159. As evidenced by the "really, really grainy" video played for the jury, Appx1161, Appx2565, TerraVision was nothing more than prototype, a crude prototype. Google offered no evidence, from Mr. Lau or from anyone else, that any of its development objectives were met. If TerraVision was ever confirmed to work for its intended purpose or was ever finished, Google's witnesses did not tell the jury when that happened or what informed this conclusion. The jury heard no evidence, much less substantial evidence, from which it could find that SRI TerraVision was ready for patenting at

the time it was demonstrated at the 1994 Magic Symposium and/or at SIGGRAPH '95.

D.     Claim 3 Was Not Proven Obvious

The bulk of Google's obviousness case rested on Dr. Goodchild's unexplained conclusions that whatever might be missing in the T_Vision Paper or the alleged public uses of SRI Terravision would have been obvious to persons of ordinary skill.  For claim 3, Google tendered proof that was marginally better, though still insubstantial.  The district court erred in denying judgment as a matter of law, notwithstanding the jury's finding (in response to Question No. 8) that claim 3 is "invalid as obvious in view of the combination of the T_Vision Paper, the Global Mapping Patent, and the knowledge and skill of a person of ordinary skill in the art."

As noted above, claim 3 depends on claim 2, which requires (1) alteration of the selectable location, followed by (2) a repeat of steps (b) through (g).  The first point was barely mentioned by Google's expert and the second not addressed at all:

> Q.    What is your opinion regarding whether the T_Vision publication, Exhibit 1001A, discloses claim 2 of the '550 patent?

> A.    So what claim 2 is about is moving the user's point of view, and the consequences of that.  And in the T_Vision publication, there is clear reference to having control over the information to view, at what time and in what location, and about how once the view changes, the database will go through the Quadtree to find the appropriate level of detail.  Appx1309.

After pointing out the Global Mapping patent's reference to coordinate transformations, Dr. Goodchild provided the following "analysis" of how that disclosure would have been combined by persons of ordinary skill with that of the T_Vision Paper to arrive at the invention of claim 3:

> And although I'm not a lawyer, I do understand when you make an obviousness argument, it's necessary to argue that the person making that connection would have been motivated to do so. And one of the standard ways of demonstrating motivation is to show that the combination would result from combining two well-known bodies of art in a way that produced a new technology that was more powerful than either of them alone. Appx1311-1312

Dr. Goodchild was only half right on the law. While the motivation to combine prior art is relevant to a competent obviousness analysis, *see Apple, Inc. v. Samsung Electronics Co.*, App. No. 2015-1151, slip op. at 29 (Fed. Cir. Oct. 7, 2016), a combination that yields "a new technology that was more powerful than either of them alone" is more likely to be *nonobvious* than obvious. In any event, after laying out his rudimentary understanding of the relevant test, Dr. Goodchild then failed to apply it. He never testified -- because he was not asked -- about what if anything would have motivated skilled artisans to combine the T_Vision Paper with the Global Mapping patent. The jury heard no evidence, either from Dr. Goodchild or from any other witness, as to what motivation would have led ordinary artisans to the invention of claim 3. Its verdict on Question No. 8 is not supported by substantial evidence.

## IV.    WILLFUL INFRINGEMENT MUST BE TRIED ON REMAND

When the district court granted Google's motion for summary judgment of no willful infringement, it based its decision entirely on the objective prong of *In re Seagate Technology*, LLC, 497 F.3d 1360 (Fed. Cir. 2007 (*en banc*).  The court charged ACI with proving that "an objectively-defined risk" was either known or so obvious that it should have been known to Google.  DI 354 at 17.  *Citing Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc*., 620 F.3d 1305, 1319 (Fed. Cir. 2010), the court noted this objective prong is generally not met "where an accused infringer relies on a reasonable defense to a charge of infringement."  Appx6095.  Google's defenses were reasonable, in the district court's view, based on what was found in Google's summary judgment papers, specifically its defense based on the T_Vision paper.  Appx6096.[8]  Regardless of whether Google prevailed on this anticipation defense, a reasonable litigant, in the district court's view, "could reasonably expect this defense to succeed."  *Id*.  And on that basis, the Court granted Google's motion.  *Id*.

Six weeks after it did, the Supreme Court decided *Halo Electronics, Inc. v. Pulse Electronics, Inc*., 136 S.Ct. 1923 (2016), a decision that undercut the district court's reliance on *Seagate* and its "objective prong" progeny.  "The principal problem with *Seagate's* two-part test is that it requires a finding of objective

---

[8]     The district court referred to this paper as "the Sauter reference."

60

recklessness in every case before district courts may award enhanced damages." *Halo Electronics*, 136 S.Ct. at 1932. In the Court's view, the *Seagate* test "aggravates the problem by making dispositive the ability of the infringer to muster a reasonable (even though unsuccessful) defense at the infringement trial." *Id*., at 1933.

Any trial on remand of this matter must include willfulness. The district court summarily entered judgment on this issue based solely on the objective reasonability of Google's trial defenses. In light of *Halo Electronics*, this is not a valid basis for denying a patentee their day in Court. Were this case tried to a jury, that jury could easily find that:

- the principals who developed Google Earth (especially Mr. Jones) were aware of ACI's invention years before their first line of source code was written;

- once made aware of patents in the '550 family, Google personnel (especially Mr. Jones) misrepresented what Google was doing in an effort to convince ACI that Earth was outside their patent;

- with full knowledge of the '550 Patent, Google made no effort to design around it, but instead expanded the scope of its infringement by, e.g., releasing Earth for Maps in 2014.

This case presents a triable fact issue on willful infringement. The district court reached a different conclusion only by invoking the *Seagate* "objective prong," which was subsequently discredited in *Halo Electronics*. Google has never disputed that this predictable shift in the law of willful infringement would require the district court to revisit the issue.

## <u>CONCLUSION</u>

ACI requests this Court to find that the '550 Patent is infringed by the accused Google Earth products and was not proven invalid by Google, to reverse the district court's denial of judgment as a matter of law on these issues, and to remand this matter for a trial on damages. Should this Court grant that relief, ACI further requests that it vacate the district court's judgment that Google did not infringe willfully, allowing for a jury trial of that issue, too.

_____/s/Scott F. Partridge
Scott F. Partridge
BAKER BOTTS L.L.P.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of December, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of appeals for the Federal Circuit through the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/  Scott F. Partridge
Scott F. Partridge
Baker Botts L.L.P.

## CERTIFICATE OF COMPLIANCE

This brief complies with the limitations of Fed. R. App. P. 32(a)(7)(B). Excluding those portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), it contains 13,839 words as determined by the automated count routine of Microsoft Word.   This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), having been prepared in proportionally spaced typeface in 14 point Times New Roman font.

/s/  Scott F. Partridge
Scott F. Partridge
Baker Botts L.L.P.

ADDENDA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ART+COM INNOVATIONPOOL GMBH,

        *Plaintiff*;

      v.

GOOGLE INC.,

        *Defendant*.

Civil Action No. 1:14-217-TBD

## JUDGMENT

This 31st day of May 2016, the Court having held a jury trial, and the jury having rendered a verdict, pursuant to Fed. R. Civ. P. 58(b)(2), **IT IS HEREBY ORDERED** that:

1. Judgment is entered for Defendant Google Inc. and against Plaintiff ART+COM Innovationpool GmbH on the First Amended Complaint (D.I. 9).

2. Defendant Google Inc. did not infringe claims 1, 3, 14, or 28 of U.S. Patent No. RE44,550.

3. Claims 1, 3, 14, and 28 of U.S. Patent No. RE44,550 are invalid.

Honorable Timothy B. Dyk
United States Circuit Judge, sitting by designation

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ART+COM INNOVATIONPOOL GMBH,      )
                                  )
                Plaintiff,        )
                                  )
        v.                        )   C.A. No. 14-217 (TBD)
                                  )
GOOGLE INC.,                      )
                                  )
                Defendant.        )

### AMENDED JUDGMENT

IT IS ORDERED that the Court's Judgment entered on May 31, 2016 (D.I. 416) is amended as follows:

This 31st day of May 2016, the Court having held a jury trial, and the jury having rendered a verdict, pursuant to Fed. R. Civ. P. 58(b)(2), IT IS HEREBY ORDERED that:

1.      Judgment is entered for Defendant Google Inc. and against Plaintiff ART+COM Innovationpool GmbH on the First Amended Complaint (D.I. 9).

2.      Defendant Google Inc. did not infringe claims 1, 3, 14, or 28 of U.S. Patent No. RE44,550.

3.      Claims 1, 3, 14, and 28 of U.S. Patent No. RE44,550 are invalid.

4.      Google's defenses of inequitable conduct and laches are denied solely on the ground that they are moot in light of the jury's finding of non-infringement and invalidity.

Honorable Timothy B. Dyk
United States Circuit Judge (sitting by
designation)

*Filed in open Court this 27th day of May 2016.*
*nms.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ART+COM Innovationpool GmbH., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 14-cv-217-TBD |
| | ) | |
| vs. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| GOOGLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

2016 MAY 27 PM 2:0

## VERDICT FORM

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below. Please answer each and every question on this verdict form, unless otherwise directed. As used herein, "ACI" means ART+COM Innovationpool GmbH. As used herein, "Google" means Google Inc.

**QUESTION NO. 1**

Do you find that ACI has proven by a preponderance of the evidence that Google's use of the accused Google Earth products infringes the following claims of U.S. Patent No. Re 44,550?

| | YES (for ACI) | NO (for Google) |
|---|---|---|
| Claim 1 | | ✓ |
| Claim 3 | | ✓ |
| Claim 14 | | ✓ |
| Claim 28 | | ✓ |

## QUESTION NO. 2

Do you find that Google has proven by clear and convincing evidence that SRI's TerraVision system was publicly used before December 17, 1995?

YES (for Google) _____✓_____          NO (for ACI) _____

## QUESTION NO. 3

If you answered yes to Question No. 2, do you find that Google has proven by clear and convincing evidence that SRI's TerraVision system anticipates (that is, constitutes a public use of) any of the following claims of U.S. Patent No. Re 44,550?

|          | YES (for Google) | NO (for ACI) |
|----------|------------------|--------------|
| Claim 1  | ✓                |              |
| Claim 3  | ✓                |              |
| Claim 14 | ✓                |              |
| Claim 28 | ✓                |              |

2

**QUESTION NO. 4**

If you answered <u>**yes**</u> to Question No. 2 and <u>**no**</u> to Question No. 3, do you find that Google has proven by clear and convincing evidence that any of the following claims of U.S. Patent No. Re 44,550 are invalid as obvious based on SRI's TerraVision system and the knowledge of a person of ordinary skill in the art at the time of the alleged invention?

|  | YES (for Google) | NO (for ACI) |
|---|---|---|
| Claim 1 |  |  |
| Claim 3 |  |  |
| Claim 14 |  |  |
| Claim 28 |  |  |

N/A

3

**QUESTION NO. 5**

Do you find that Google has proven by clear and convincing evidence that the T_Vision Paper was a printed publication before December 17, 1995?

YES (for Google) _____✓_____        NO (for ACI) _____

**QUESTION NO. 6**

If you answered yes to Question No. 5, do you find that Google has proven by clear and convincing evidence that the T_Vision Paper system anticipates any of the following claims of U.S. Patent No. Re 44,550?

|          | YES (for Google) | NO (for ACI) |
|----------|------------------|--------------|
| Claim 1  | ✓                |              |
| Claim 14 | ✓                |              |
| Claim 28 | ✓                |              |

**QUESTION NO. 7**

If you answered **yes** to Question No. 5 and **no** to Question No. 6, do you find that Google has proven by clear and convincing evidence any of the following claims of U.S. Patent No. Re 44,550 are invalid as obvious based on the T_Vision Paper system and the knowledge of a person of ordinary skill in the art at the time of the alleged invention?

|          | YES (for Google) | NO (for ACI) |
|----------|------------------|--------------|
| Claim 1  |                  |              |
| Claim 14 |                  |              |
| Claim 28 |                  |              |

N/A

4

**QUESTION NO. 8**

If you answered yes to Question No. 5, do you find that Google has proven by clear and convincing evidence that claim 3 of U.S. Patent No. Re 44,550 is invalid as obvious in view of the combination of the T_Vision Paper, the Global Mapping Patent, and the knowledge and skill of a person of ordinary skill in the art at the time of the alleged invention?

|  | YES (for Google) | NO (for ACI) |
|---|---|---|
| Claim 3 | ✓ |  |

**QUESTION NO. 9**

*Please answer this question only if you have found at least one of claims 1, 3, 14, and 28 to have been proved infringed by ACI and not proved invalid by Google.*

What is the amount of reasonable royalty damages you have determined for Google's infringement of U.S. Patent No. Re 44,550?

$_____N/A_____

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your unanimous determinations. The Foreperson should then sign and date the verdict form in the spaces below and notify the Court Security Officer that you have reached a verdict. The Foreperson should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

DATED: May 27, 2016



5

US00RE44550E

(19) **United States**

(12) **Reissued Patent**　　　　(10) Patent Number:　　**US RE44,550 E**

Mayer et al.　　　　　　　　　　(45) Date of Reissued Patent:　　**Oct. 22, 2013**

---

(54) **METHOD AND DEVICE FOR PICTORIAL REPRESENTATION OF SPACE-RELATED DATA**

(71) Applicant: **Art+Com Innovationpool GmbH,** Berlin (DE)

(72) Inventors: **Pavel Mayer**, Berlin (DE); **Axel Schmidt**, Berlin (DE); **Joachim Sauter**, Berlin (DE); **Gerd Gruneis**, Berlin (DE)

(73) Assignee: **ART + COM Innovationpool GmbH,** Berlin (DE)

(21) Appl. No.: **13/773,341**

(22) Filed: **Feb. 21, 2013**

**Related U.S. Patent Documents**

Reissue of:

(64) Patent No.: **Re. 41,428**
　　　 Issued: **Jul. 13, 2010**
　　　 Appl. No.: **12/006,231**
　　　 Filed: **Dec. 31, 2007**

Which is a Reissue of:

(64) Patent No.: **6,100,897**
　　　 Issued: **Aug. 8, 2000**
　　　 Appl. No.: **08/767,829**
　　　 Filed: **Dec. 17, 1996**

(30) **Foreign Application Priority Data**

　Dec. 22, 1995　(DE) ................................... 19549306

(51) **Int. Cl.**
　　　*G06T 15/00*　　　(2011.01)

(52) **U.S. Cl.**
　　　USPC ........... **345/428**; 345/419; 345/441; 345/619; 345/629; 702/3

(58) **Field of Classification Search**
　　　USPC ......... 345/419, 426, 427, 428, 432, 433, 441, 345/619, 629, 631, 132, 133; 702/3
　　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,672,444 A | 6/1987 | Bergen et al. |
| 4,847,788 A | 7/1989 | Shimada |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 3639026 A1 | 5/1987 |
| DE | 4209936 A1 | 9/1993 |

(Continued)

OTHER PUBLICATIONS

K.R. Sloan, Jr., et al., "Progressive Refinement of Raster Images", IEEE Transactions on Computers, Nov. 11, 1979, vol. C-28, No. 11, pp. 871-874.

(Continued)

*Primary Examiner* — Phu K Nguyen
(74) *Attorney, Agent, or Firm* — Baker Botts L.L.P.

(57) **ABSTRACT**

A method and device for the pictorial representation of space-related data, for example, geographical data of the earth. Such methods are used for [ [visualising] ] visualizing topographical or meteorological data in the form of weather maps or weather forecast films. Further fields of application are found in tourism, in traffic control, in navigation aids and also in studio technology. The space-related data, for example topography, actual cloud distribution, configurations of roads, rivers or frontiers, satellite images, actual temperatures, historical views, CAD-models, actual camera shots, are called up, stored or generated in a spatially distributed fashion. For a screen representation of a view of the object according to a field of view of a virtual observer, the required data are called up and shown only in the resolution required for each individual section of the image. The sub-division of the image into sections with different spatial resolutions is preferably effected according to the method of a binary or quadrant tree.

**85 Claims, 11 Drawing Sheets**



**US RE44,550 E**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,876,517 A | 10/1989 | Roy et al. |
| 5,602,564 A | 2/1997 | Iwamura et al. |
| 5,949,551 A | 9/1999 | Miller et al. |
| 5,953,506 A | 9/1999 | Kalra et al. |
| 6,490,525 B2 | 12/2002 | Baron et al. |
| 6,493,633 B2 | 12/2002 | Baron et al. |
| 6,525,732 B1 | 2/2003 | Gadh et al. |
| 6,937,210 B1 | 8/2005 | MacDonald |
| 8,081,186 B2 * | 12/2011 | Wong et al. .................. 345/428 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 587 443 A2 * | 3/1994 |
| EP | 0 684 585 A2 * | 11/1995 |
| EP | 0780800 A3 | 6/1997 |

OTHER PUBLICATIONS

J.D. Foley et al., "Computer Graphics Principles and Practice", Addison-Wesley Publishing Company copyright 1990, pp. 548-557, 844-846, 880-882.

R.D. Bess (XP 000857702), "Image Generation Implications for Networked Tactical Training Systems", published Sep. 18, 1993, pp. 308-317, Bellevue Washington.

Y.G. Leclerc, et al., "SRI International-Terra Vision: A Terrain Visualization System", Apr. 22, 1994, 20 pages.

D. Koller et al. (XP 000585396), "Virtual GIS: A Real-Time 3D Geographic Information System", pub. Oct. 29, 1995, pp. 94-100, Proceedings of the 6th IEEE Visualization Conf.

Sauter, Joachim, "The Terravision Project: A Global Mirror", 1995, 4 pages, www.doorsofperception.com.../doors3/transcripts/sauter.

Grueneis, et al. (XP-000986312), "T-Vision", in Visual Proceedings. The Art and Interdisciplinary Programs of Siggraph 95, Aug. 1995, p. 134.

CD-ROM Materials from Siggraph 95, Aug. 6-11, 1995, in Los Angeles, CA, USA: "The T_Vision Project".

Declaration of Pavel Mayer filed under 37 C.F.R. 1.132.

Barbara B. Fuller et al., An Overview of the Magic Project, Dec. 1993.

Y.G. Leclerc, SRI International, "Tile Set Definitions," Technical Note No. 541, Apr. 28, 1994, 18 pages.

Brian L. Tierney et al., "The Image Server System: A High-Speed Parallel Distributed Data Server," Lawrence Berkeley Laboratory Report 36002, 1994, 12 pages.

Brian Tierney et al., "Distributed Parallel Data Storage Systems: A Scalable Approach to High Speed Image Servers," Proc. ACM Multimedia, 1994, 11 pages.

Brian L. Tierney et al., "Using High Speed Networks to Enable Distributed Parallel Image Server Systems," Proc. Supercomputing, 1994, 10 pages.

Brian L. Tierney et al, "System Issues in Implementing High Speed Distributed Parallel Storage Systems," USENIX Symposium on High Speed Networking, 1994, 15 pages.

Y.G. Leclerc et al., SRI International, 1994 Magic Technical Symposium Presentation, 1994, 22 pages.

Yvan G. Leclerc, Magic Final Report, SRI International, May 1996, 14 pages.

Barbara Fuller and Ira Richer, "The Magic Project: From Vision to Reality," May/Jun. 1996, 11 pages.

CD-ROM Materials from Siggraph 95, Aug. 6-11, 1995, in Los Angeles, CA, USA: "Magic Gigabit Testbed".

Excerpts from Deposition of Stephen Lau, Jr., filed in *Skyline Software Systems, Inc. v. Keyhole, Inc., and Google, Inc.,* 17 pages.

* cited by examiner



FIG. 1



FIG.2



FIG. 3



FIG. 4



FIG.5



FIG.6



FIG. 7



FIG. 8



FIG.9



FIG. 10



FIG. 11

US RE44,550 E

1

## METHOD AND DEVICE FOR PICTORIAL REPRESENTATION OF SPACE-RELATED DATA

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of the first and this reissue specification; matter printed in italics indicates the additions made by the first reissue. Matter enclosed in double heavy brackets [[ ]] appears in the first reissue patent but forms no part of this reissue specification; matter printed in bold face indicates the additions made by this reissue.**

The invention relates to a method and a device for pictorial representation of space-related data, particularly geographical data of flat or physical objects. Such methods are used for example for [[visualising]] **visualizing** topographic or meteorological data in the form of weather maps or weather forecast films. Further fields of application arise from tourism, in traffic control, as navigation aids and in studio technology.

Representations of geographical information are generated according to prior art by so-called paintbox. The latter generates from given geographical information maps of a desired area, which are then selectably altered, and for example can be [[coloured or emphasised]] **colored or emphasized** according to states, or even represented in an altered projection.

Another system for generating views of a topography is found in [[the]] known flight [simulator] *simulators*. In this case, starting from a fictitious observation point from the cockpit of an aircraft, a view of the surroundings is generated.

Electronic maps, such as are marketed today on CD-ROM memories, or navigation systems in terrestrial vehicles, likewise generate from [[a]] fixed databases a diagrammatic [[vies]] *view* of the geography of a desired area. These systems however do not have the capacity for representing various views of the area, but are restricted to mapping topographical features such as the configuration of roads, railway lines or rivers.

All the [names] *named* methods and devices for [[visualising]] **visualizing** geographical data [[utilise]] *utilize* fixed data sets in order to generate the desired images. The resolution of the representation is therefore limited to the resolution of the data sets stored in a memory unit. Further, only those space-related data can be observed which are provided in the respective data bank. Thus it is not for example possible to provide representations which have been generated on the basis of electronically stored maps in navigation systems with the actual cloud distribution over this area. On the other hand, flight simulators, due to the limited availability of memory space, are limited to representing narrowly defined areas with a pre-fixed resolution.

As representations from the previously known system are based on a fixed set of [memorised] *stored* data and therefore the space-related data cannot be stored at any optional resolution, none of the present systems is capable of representing different space information as desired with any resolution and at the same time incorporating actual information into the representation.

Due to the large quantities of data to be processed in the systems according to prior art, the generation of an image is either extremely costly in time, or is limited to the representation of restricted information. Consequently it is not possible with the previously known systems to provide an image generation rate which is sufficient upon alteration of the loca-

2

tion or of the direction of view of the observer to provide the impression of a continuous movement of that observer.

The object of the present invention is to make available a method and a device for representing space-related data which [[enables]] **enable** the data to be represented in any pre-selected image resolution in the way in which the object [has] *would have* been seen by an observer with a selectable location and selectable direction of view. A further object of the invention is to keep the [outlay] *effort required* for generating an image so low that the image generation takes place so rapidly that upon alteration of the location and/or the direction of view of the observer, the impression of [[continuos]] **continuous** movement above the object arises.

[[This object is]] **These objects are** achieved by the method according to the invention in the preamble in conjunction with the [[characterising]] **characterizing** features of claim 1, and by the corresponding device.

In the method according to the invention the space-related data are called up, stored and/or generated in spatially distributed data sources. These data sources include for example data memories and/or other data sources which call up and/or generate space-related data. The portion of the object to be observed, the field of view, is determined from the selected location and the selected direction of view of the observer. Then a first data set, which has a coarse spatial resolution, is called up from at least one of the spatially distributed data sources, transmitted and centrally stored, and the field of view is shown. If the resolution of the representation is below the desired image resolution, the field of view is divided into sections and an investigation is undertaken for each individual section to see whether the data within the section are sufficient for a representation with the desired image resolution. If this is not the case for one of the sections, partial data with a finer resolution are called up, transmitted and centrally stored from at least one of the spatially distributed data sources, and the section is shown with the new data. In turn [an investigation is carried out into] *a check for* sufficient image resolution and possibly a further sub-division of the tested section [is carried] [[out]] into further partial sections *is performed* as described above. If the entire representation has the desired image resolution or if in the spatially distributed data sources no further data of a higher resolution are present, then the method is terminated.

The device according to the invention for carrying out this method accordingly comprises a display unit and an input unit for the location and the direction of view of the observer. The device according to the invention further has a plurality of spatially distributed data sources, a central data memory, **and** a data transmission network between these and [the] *an* evaluation unit, in order to determine the representation of the data on the display unit from the centrally stored data.

In comparison to previous systems, the method according to the invention has considerable advantages. By virtue of the fact that the data are called up, generated and/or stored in a spatially distributed manner, the magnitude of the available database is not limited by the size of the central data memory. In principle the amount of available data in the method according to the invention is therefore not limited, and can be extended at will. The access speed to the spatially distributed data is thus to a large extent independent of the size of the database.

In particular, due to the spatially distributed call-up and storage of the data, servicing and updating of the database can be effected in a distributed manner and preferably in the vicinity of the spatial area which is represented by the data which are called up and/or stored in a spatially distributed manner.

US RE44,550 E

3

Representation of the field of view requires in the individual areas of the field of view different spatial resolutions of the data, for example depending on whether a portion of the field of view is in the immediate vicinity of the observer or at a great distance therefrom.

The method according to the invention leads to a situation in which the data for the field of view to be shown are called up from the spatially distributed data sources only in the accuracy necessary for representation of the field of view with the desired image resolution, i.e. for example with high spatial resolution for close areas of the field of view or in low spatial resolution in a view to the horizon of a spherical object. The [[number]] **amount** of data necessary for representation of the field of view and thus to be stored certainly is in principle determined by the image resolution selected and is thus substantially constant for each image. This applies for example independently of whether the observer is at a great distance from the object or directly beside it and whether the observer is looking frontally on to the object or in the direction of the horizon. Therefore, the [outlay] *effort required* for data transmission for representing the various fields of view is to a large extent constant and restricted.

Furthermore, by means of the [[number, reduced to a minimum.]] **amount** of data to be centrally stored **being reduced to a minimum** as a result of the method according to the invention, the memory requirement and computer time for generating the pictorial representation is greatly reduced, so that an extremely rapid image build-up becomes possible.

Advantageous further developments of the method according to the invention and of the device according to the invention are given in the dependent Claims.

If a change in the location or of the direction of view of the observer is input, thus the field of view also changes. Immediately after this alteration in field of view, the method according to the invention can be restarted. In this way it is possible to generate a representation which corresponds to the impression of a moving observer. This can for example be used for setting up a flight simulator.

After each transmission and central storage of data, an image representation results, even if the data are insufficient to make possible the desired image resolution. As a result, even if the method is interrupted due to an alteration in the field of view and newly begun for a new field of view, the data for an image, even at low resolution, are always available. Thus if the observer moves extremely rapidly, the case is avoided in which no [further] image is shown.

Thus the observer is not limited as [[regards]] **to** his travelling speed and yet it is ensured that an image is always shown.

It is particularly advantageous if the same [[number]] **amount** of data, i.e. data with the same uniform resolution, are basically [[also]] always called up for a section. [[Due]] **In this way, due** to the division and thus reduction in size of the sections during the method according to the invention, [[in this way]] continuous refinement of the data during the course of the method according to the invention is achieved.

After alteration in the field of view, in order to reduce the central storage requirement, the high-resolution data no longer required can be removed from the central memory. If however a data set with coarse resolution which represents the entire object is permanently retained in the central memory, the representation can be improved with rapid alterations in field of view.

For objects to be viewed in the plane, the binary or the quadrant tree is suitable as a sub-division method for the field

4

of view, while for objects, whose three-dimensional extension must be taken into account, an octant tree is particularly suitable.

By means of this sub-division according to a fixed scheme, each section of the object can be given a fixed address, the address of a section arising for example from the address of the master section, to which there is added for the sub-sections a further numeral, for example 0, 1, 2 and 3 for each of the four sub-sections of the quadrant tree, or the numerals 0 to 7 for each of the sub-sections of an octant tree. With a permanently constant number of data per section, the number of points in a section address at the same time determines the spatial resolution level of the data.

These sub-dividing processes can also be used along with one another, such an adaptive sub-division process being particularly suitable for spherical objects, whose surface is imaged two-dimensionally. In the planar representation of a spherical surface, for example at the poles, the sphere can transfer from a quadrant tree to a binary tree.

Particularly suitable as objects are heavenly bodies such as the planets of the solar system, whose topography can be represented. Further space-related data of such objects include among other things meteorological or geological information, for example cloud distributions, political, economic and social data and in particular [[colour]] **color** information relating to the appearance of the heavenly bodies, as obtained for example for the earth from satellite images and for other planets, from images from space probes.

Consequently, any further geographically related data can be represented. The representation may in this case be carried out also according to cartographic points of view or also as a globe.

In order to provide pictorial representation of the surface of physical objects, two-dimensional representations are particularly suitable, as due to the reduction in the number of dimensions from three to two the number of co-ordinates to be processed and the data to be loaded is considerably reduced and thus the power of the method according to the invention and of the device according to the invention, for example the image repetition rate during rapid movements of the observer, is improved. Such a representation in particular is sufficient when the images are shown on a two-dimensional screen or another two-dimensional medium.

In order also to display three-dimensional information in two-dimensional images, the two-dimensional basic layer may be supplemented with other two-dimensional layers, upon which the further information is displayed.

Particularly suitable as a model for two-dimensional imaging of the surface of physical bodies is a geometric model in which the surface is sub-divided into polygons. In the topographic grid model the polygon grid imitates the topography of the surface. By means of this display the provision of the two co-ordinates of a grid point is sufficient to produce a spatial relationship between various data and the surface of the object displayed.

The data are now displayed on the background of this grid. Particularly simple is the display of height information by the application of various [[colours]] **colors** ([[colour]] **color** vertices). Satellite images or information on cloud formations can also be laid over this grid ([[texturising]] **texturizing**). If the grid is not equidistant but applied with different sizes of grid squares, (adaptive grids) then it is possible [better] to [resolve and] display specific areas [such], *like,* for example, areas with intense height alterations *with better resolution.*

The spatially distributed raised and/or stored data of the spatially distributed data sources can be provided at the points of their raising and/or storage with references, which indicate

5

the storage points for data of adjacent areas or further data on the same area. If such links (hyperlinks) of the spatially distributed data exist between one another, the central system requires no knowledge of the exact spatial storage points for all data of the object, as it is linked, originating from one of the spatially distributed stores, to the further data.

In principle, the location and the direction of view of the observer is not limited. Consequently the observer can move from a view with extremely limited resolution, e.g. the earth from space, to a view of individual atoms. The range of spatial resolutions covers many orders of magnitude. In order to enable any resolutions [ [also with] ] while also using evaluating devices which operate internally with a limited numerical precision, for example with computers with an address space limited to 32 bits and/or floating-point view limited to 32 bits for numbers, after an alteration in the location and of the angle of view of the observer, the data are converted to a new co-ordinate system with a new co-ordinate origin. During a continuous movement of the observer therefore the co-ordinates of the data are constantly subjected to co-ordinate transformation.

If the data of areas adjoining the field of view are permanently centrally stored in a higher resolution, or if a probability assessment is carried out for a future alteration in the field of view, and the data of the areas with the highest probability are previously called up, transmitted and centrally stored, the representation can be accelerated with the desired image resolution upon a rapid alteration in the field of view.

The data illustrated by the method according to the invention, in addition to data of real properties of the system observed, can also contain models, for example CAD models of buildings, or animated objects. The representation of spatially related data, for example temperature measurement values, can also be effected by display tables inserted into the illustration. Furthermore, it is possible to move from illustrated space related spatially distributed stored data to the representation of directly generated material. Thus for example, instead of showing spatially distributed stored satellite images of the earth, direct camera images from a satellite can be shown, or instead of the illustration of a public place, images of the place generated by a running camera can be shown. In this case the satellite represents one of the spatially distributed data sources.

For data transmission from the spatially distributed data sources to the central memory, asynchronous transmission methods are suitable. because of their high data transmission rate in particular.

Embodiments of the method according to the invention and of the device according to the invention are given by way of example in the following:

FIG. 1: a structure of a device according to the invention;

FIG. 2: a device according to the invention;

FIG. 3: [ [a diagram of the sub-division of the field of view in two sections according to the model of a quadrant tree] ] the categorization of the field of view into different detail levels;

FIG. 4: [ [a diagram of an adaptive sub-division of the field of view into a binary or quadrant structure] ] a diagram of the sub-division of the field of view in two sections according to the model of a quadrant tree;

FIG. 5: [ [a diagram of the sub-division of the field of view into sections according to the model of an octant tree] ] a diagram of an adaptive sub-division of the field of view into a binary or quadrant structure;

6

FIG. 6: [ [the interconnection of individual data sections by transverse references] ] a diagram of the sub-division of the field of view into sections according to the model of an octant tree;

FIG. 7: [ [the categorisation of the field of view into different detail levels] ] the interconnection of individual data sections by transverse references;

FIG. 8: a cartographic view of a cloud distribution on the earth;

FIG. 9: a view of a cloud distribution on the earth as a globe;

FIG. 10: a view of the earth as a globe with cloud distribution;

FIG. 11: a view of a portion of the earth with temperature indicator tables.

FIG. 1 shows the construction of a device according to the invention for displaying geographically related data of the earth. The device comprises a plurality of spatially distributed data sources 4, a data transmission network, a plurality of devices 1, 2 and 3 as central memories[ [,] ] and devices for determining the display of the centrally stored space-related data (evaluation units), and a plurality of display [ [unit] ] units 5. This device according to the invention makes it possible for a plurality of evaluation units 1, 2 and 3 [ [simultaneously] ] together to access the common spatially distributed data sources 4.

The data transmission device comprises a transmission network with lines 6, 7 and 8. The network has various types of conduit. The conduits 6 serve as a collecting network for transmitting data from the spatially distributed data sources 4. The conduits 7 serve as an interchange network for rapid interchange of information between individual nodes and the conduits 8 serve as a supply network for supplying the screen view from the evaluation devices 1, 2 and 3 to the display unit 5.

The nodes are in turn sub-divided into primary nodes 1, secondary nodes 2, and tertiary nodes 3. In this case a primary node is connected both to the interchange network 7 and also via the conduits 6 directly to the spatially distributed data sources and by the conduit 8 directly with the display unit 5. The secondary node [ [8] ] 2 is connected only with the interchange network 7 and directly via the conduits 8 with the display unit 5. The tertiary node 3 has only one connection to the display unit 5 and to the interchange network 7.

Systems of the company Silicon Graphics (SGI Onyx) were used as a node computer. This computer is capable of displaying more than 5[.]00,000 [ [texturised] ] texturized triangles per second and consequently is suitable for rapid picture build-up. It operates with floating-point views with a 32 bit representation. As this accuracy in the present example is insufficient for example to follow a movement of an observer from space continuously down to a [ [centimetre] ] centimeter resolution on the earth, the co-ordinates of the data during such a movement were continuously converted to a new co-ordinate system with a coordinate origin located in the vicinity of the observer.

The geographical data required for the image are called up and transmitted via the collecting network 6 from the spatially distributed memories 4. The spatially distributed memories are preferably located in the vicinity of the areas on the earth whose data they contain. In this way the data are detected, stored and serviced at the point where a knowledge of the properties to be represented by the data, [ [such for example as] ] such as, for example, topography, political or social information, etc. is most precise. Further data sources are located at the points where further data are detected or assembled, [ [such for example as] ] such as, for example,

US RE44,550 E

7

meteorological research stations which collect and process information received from satellites.

A characteristic feature of the data flow in the collector network 6 is that the data flow is in one direction. The Internet or ISDN lines were used for this network.

The interchange network 7 serves to interchange data between individual nodes. By means of close-meshed connection of the individual nodes, the network can be secured against the failure of individual conduits or against load peaks. As the interchange network 7 must guarantee a high transmission rate in both directions, a permanent connection was used here with an asynchronous transmission protocol with a transmission rate which is greater than 35 MBit/s. Satellite connections are also suitable for the interchange network 7.

In the supply network 8, substantially **all of** the image data required for representation are transmitted to the display device 5. Consequently a high data transmission rate of up to 2 MBit/s is required in the direction of the display unit, which is enabled by intrinsic asynchronous connections or by bundling ISDN connections.

FIG. 2 shows two nodes connected by an interchange network 7, a primary node 1 and a tertiary node 3. An input medium 10 for input of the location and the direction of view of the observer is connected via the supply network 8 to the tertiary node 3. A collector network 6 and a camera 9, which can be controlled by the input medium 10, is connected to the node computer 1. The input medium 10 [comprised] *consists of a* three-dimensional track ball in conjunction with a space-mouse with six degrees of freedom, in order to be able to alter both the location and the direction of view of the observer. Automatic position-fixing systems can also be considered as further input media, such as are used in navigation aids for motor vehicles or aircraft.

In this embodiment given by way of example, a two-dimensional polygon grid model is used to display the data, which serves as a three-dimensional co-ordinate system for positioning the data. [[There were used as data]] **Data** to be displayed **includes**, for example satellite images, i.e. information relating to the [[colouring]] **coloring** of the earth surface or geopolitical data or actual or stored meteorological data. Images of the same point on the earth surface [[were]] **may be** shown at different points in time, so that a type of "time journey" [[could]] **may** be produced.

Data in tabular form, [[such for example as]] **such as, for example,** temperature information, were masked in as display tables into the view. For certain areas, CAD-models of buildings were available, which were inserted into the view. Then the location of the observer could be displaced at will in these [[CAD-modelled]] **CAD-modeled** buildings.

Via position-fixing systems, symbols, for example for ships, aircraft or motor vehicles, in their instantaneous geographical positions, can be inserted into this system and/or animated.

There was used, as a model for sub-dividing the field of view into sections and of these sections into further sections, a quadrant tree in which a progressive sub-division of an area into respectively four sections is carried out.

After selection of the earth as an object and input of a location and a direction of view in the [[final]] **display** device 5, the node 3 determines the field of view of the observer and calls up the data via the interchange network 7 and the nodes 1 and 2. These nodes in turn call up, via the collecting network 6, from the spatially distributed data sources 4 or for example from the camera 9, the required data and transmit them over the interchange network 7 to the node 3 for central storage. The node 3 determines the representa-

8

tion of the data centrally stored therein and sends this transmission for viewing over the supply network 8 to the display device 5.

If the node 3 then ascertains that the required screen resolution has not been achieved with the centrally stored data, it divides the field of view according to the model of the quadrant tree into four sections and checks each section to see whether, by representation of the data contained in the sections, the required image resolution has been achieved. If the required image resolution is not achieved, the node 3 calls up further data for this section. This method is repeated for each section until the required image resolution is achieved in the entire view. Call-up of the data is effected in this example always with the same resolution of 128×128 points. Due to the sub-division of a section into four respective sub-sections, therefore, in each data transmission data are loaded which have a spatial accuracy four times higher.

FIG. 3 shows diagrammatically the view of an object 18 by an observer whose field of view is limited by the two lines 17. As the pictorial representation remains the same, the required spatial resolution of the data depends on its distance from the observer. For objects located directly in front of the observer, data must be available with a greater spatial resolution than for objects further removed, in order to reach this image resolution.

FIG. 3 shows in all four different sub-division stages according to the model of the quadrant tree. The object entered extends within the field of view over three resolution stages in all. The data for the area of the object belonging to the field of view must therefore be loaded with greater spatial resolution in the direction of the observer.

By virtue of the fact that the data are centrally stored in sections only in the accuracy required for image resolution, the [[number]] **amount** of centrally stored data depends substantially [[only]] on the desired image resolution.

If for example one is located approximately 1,000 m above the earth surface, the field of view has an extent of approximately 50 km×50 km. The image resolution in this case should be greater than 3,000×3,000 image points. In order to show the field of view with this image resolution a height value is required every 150 m and an image value of a surface every 15 m. From this there arises a central storage requirement of approximately 35.6 MBytes, in order to store all the required information for showing the image.

If however one is located in space and has the northern hemisphere fully in field of view, then there is required for a representation with the same image resolution a height value every 50 km and an image value of the surface every 5 km. In all there arises a central storage requirement of 39.2 MBytes, which lies in the same order of magnitude as the storage requirement for representation of the view of the earth surface from a height of 1,000 m in the section 50 km×50 km.

FIG. 4 shows the formation of an address of a section using the model of a quadrant tree for sub-division of the field of view 11. In the first sub-division of the field of view 11 into four sections 12, these are identified clockwise with the numerals 0 to 3. If a section is further sub-divided, the individual sub-sections 13 are numbered in the same way and the numbers thus obtained are prefixed to the numbers of the master section. With a permanently identical resolution of for example 128×128 points per section, the number of points of the section number is at the same time an indication of the level of spatial precision of the data.

An advantage in this type of address formation is [[further]] that each **further** section of the object to be represented has a fixed address which to a great extent simplifies the search for the associated data.

9

FIG. 5 shows how a binary tree can be mixed with a quadrant tree in order to generate an adaptive sub-division model. In the upper row of the squares the sub-division is shown in two slave sections 4 and 5 (vertical) or 6 and 7 (horizontal). In the lower part of the drawing there is shown a further sub-division of the section 4 into an elongate upper portion 46 and two lower portions 40 and 43. The section [[33]] 43 is then again sub-divided according to the model of a quadrant tree into four slave sections. Such an adaptive sub-division model can for example be used in representing the earth in a two-dimensional model in the region of the poles.

FIG. 6 shows a sub-division according to an octant tree for a representation based on a three-dimensional geometrical model. Here a section 14 or a space is sub-divided into eight spatial sub-sections 15. By means of the method according to the invention, consequently here also the data of just the spatial areas are called up in a higher accuracy, at which it is required in order to obtain the desired image resolution. Here also the same number of points, for example 128×128×128 points can be called up, transmitted and centrally stored for each section, so that during sub-division of a master section 14 into eight slave sections 15 an improved spatial accuracy of the data in the region of the individual slave sections 15 results.

FIG. 7 shows a model for the use of references (so-called "hyperlinks") on different section planes. The individual sections have references 16 to the storage point both of the data of adjacent sections and also of the data on other topics, but with the same spatial association. In this way, proceeding from the data of a section, data relating to the adjacent section or further data over the same section can be determined. In particular, the node 3 can call up the data of a section next to a section known to it without having intrinsic knowledge of the storage points of the adjacent section data. In this way the spatially distributed data call-up and storage systems may be expanded or updated at will, without the central store and evaluation units taking knowledge of the alteration during each such alteration.

FIGS. 8 to 11 show views of the earth generated by a method using a quadrant tree. The required data were called up from spatially distributed databases of research institutes.

FIG. 8 shows a view of cloud distribution on the earth surface as detected by a weather satellite. A cylindrical projection was used as a form of representation. The upper edge represents the north pole and the lower edge the south pole. A two-dimensional topographic grid network of the earth surface was selected as a representational model. As the cloud layer usually is at a distance from the earth surface, the cloud distribution was shown on a second layer located out-with the view of the earth surface. Thus there results, despite the only two-dimensional view for an observer, a possibility close to reality of approaching the earth surface "through" the cloud layer. Data generated by satellite surveillance systems of meteorological research institutes were used as data sources for the actual cloud distribution existing at the time of the imaging.

FIG. 9 shows the same cloud distribution. Now the earth has been shown as a globe, as it would appear to an observer [[is]] **in** space. FIG. 10 shows a view of the same cloud distribution in connection with a representation of the land masses of the earth as they would appear to an observer in space. In order to show the view of the earth surface, the topographical grid network was provided with [[colour]] **color** information from the pixel graphics of satellite images of the earth surface. As at the time of image generation actual

10

cloud information was used for image generation, there was a view close to reality of the earth from space at the time of image generation.

FIG. 11 shows a view generated in this way of the American [[Caribbean]] **Gulf** coast, as it would have appeared to an observer looking north in an orbit close to the earth above the [[Caribbean]] **Gulf of Mexico**. In addition, the actual temperature data of selected points present in tabular form were entered in display tables into the image. These temperature data were called up and transmitted through the interchange network from various meteorological research stations at various points.

What is claimed is:

1. A method of providing a pictorial representation of space-related data of a selectable object, the representation corresponding to [[the]] *a* view of the object by an observer with a selectable location and a selectable direction of view comprising:

(a) providing a plurality of spatially distributed data sources for storing space-related data;

(b) determining a field of view including [[the]] *an* area of the object to be represented through [[the]] *a* selection of [[the]] *a* distance of the observer to the object and [[the]] *an* angle of view of the observer to the object;

(c) requesting data for the field of view from at least one of the plurality of spatially distributed data sources;

(d) centrally storing the data for the field of view;

(e) representing the data for the field of view in a pictorial representation having one or more sections;

(f) *using a computer*, dividing each of the one or more sections having image resolutions below a desired image resolution into a plurality of smaller sections, requesting higher resolution [[space related]] **space-related** data for each of the smaller sections from at least one of the plurality of spatially distributed data sources, centrally storing the higher resolution [[space related]] **space-related** data, and representing the data for the field of view in [a] *the* pictorial representation; and

(g) repeating step (f), dividing the sections into smaller sections, until every section has the desired image resolution or no higher image resolution data is available.

2. The method of pictorial representation defined in claim 1, further including altering the selectable location and performing **the** steps (b) through (g).

3. The method of pictorial representation defined in claim 2, further including determining the data and/or the co-ordinates of the data in terms of a new co-ordinate system.

4. The method of pictorial representation defined in claim 1, further including altering the selectable direction of the view and performing **the** steps (b) through (g).

5. The method of pictorial representation defined in claim 4, further including determining the data and/or the co-ordinates of the data in terms of a new co-ordinate system.

6. The method of pictorial representation defined in claim 1, wherein **the** step (f) further includes requesting data of a uniform resolution for each of the smaller sections.

7. The method of pictorial representation defined in claim 1, wherein **the** steps (c) and (f) further include requesting data not already centrally stored from only one of the spatially distributed data sources.

8. The method of pictorial representation defined in claim 1, wherein **the** step (f) further includes showing only the centrally stored data of each section with the highest spatial density.

US RE44,550 E

11

9. The method of pictorial representation defined in claim 1, wherein **the** step (f) further includes effecting the representation of the data in an optional pre-set form of representation.

10. The method of pictorial representation defined in claim 1, further including removing the data of a section from the central store when the section passes out of the field of view due to an alteration in the location or of the angle of view.

11. The method of pictorial representation defined in claim 1, further including permanently centrally storing at least one full set of space-related data with a low spatial resolution.

12. The method of pictorial representation defined in claim 1, further including not showing **[** [the] **]** regions of the object located with respect to the observer behind nontransparent areas of the object.

13. The method of pictorial representation defined in claim 1, wherein **the** step (f) comprises dividing each of the one or more sections using a model of the binary tree.

14. The method of pictorial representation defined in claim 1, wherein **the** step (f) comprises dividing each of the one or more sections using a model of the quadrant tree.

15. The method of pictorial representation defined in claim 1, wherein **the** step (f) comprises dividing the sections using a model of the octant tree.

16. The method of pictorial representation defined in claim 1, further including using an adaptive sub-division model with a plurality of models used next to one another for subdividing the field of view into smaller sections.

17. The method of pictorial representation defined in claim 1, wherein the data are present as pixel graphics and/or as vector graphics and/or in tabular form.

18. The method of pictorial representation defined in claim 1, wherein the object is a heavenly body.

19. The method of pictorial representation defined in claim 18, wherein **the** steps (e) and (f) further include **[** [representating] **]** **representing** the data with a two-dimensional polygonal geometrical model of the topography of the object, the spatial relationship of the data being given by the provision of two co-ordinates on the polygonal geometrical model.

20. The method of pictorial representation defined in claim 19, wherein height information is represented as color vertices on the two-dimensional polygonal geometrical model.

21. The method of pictorial representation defined in claim 19, wherein an adaptive topographical grid model is used, the spatial distance between two grid lines becoming smaller as the topographical altitude becomes greater.

22. The method of pictorial representation defined in claim 19, wherein **the** step (f) further includes dividing each of the one or more sections using a model of the quadrant tree.

23. The method of pictorial representation defined in claim 22, wherein **the** step (f) further includes dividing each of the one or more sections using a model of the octant tree such that the sub-division merges into a binary tree at the poles.

24. The method of pictorial representation defined in claim 19, wherein in the two-dimensional polygonal grid model, spatial data are shown on a plurality of different two-dimensional layers.

25. The method of pictorial representation defined in claim 18, wherein the representation in **the** steps (e) and (f) is in the form of a globe.

26. The method of pictorial representation defined in claim 18, wherein the representation in **the** steps (e) and (f) is in the form of cartographic form of representation.

27. The method of pictorial representation defined in claim 1, wherein the object is the earth.

12

28. The method of pictorial representation defined in claim 1, wherein **the** steps (e) and (f) further include representing the data with a polygonal grid model.

29. The method of pictorial representation defined in claim 28, wherein **the** step (f) comprises dividing the sections using a model of the octant tree.

30. The method of pictorial representation defined in claim 1, wherein **the** steps (e) and (f) further include representing the data with a three-dimensional geometrical model of the topography of the objects, the spatial relationship of the data being given by the provision of three co-ordinates on the geometrical model.

31. The method of pictorial representation defined in claim 1, wherein the space-related data include CAD models.

32. The method of pictorial representation defined in claim 1, further including inserting animated objects into the pictorial representation.

33. The method of pictorial representation defined in claim 1, further including inserting display tables into the pictorial representation.

34. The method of pictorial representation defined in claim 1, further including inserting information and/or directly generated image material into the representation.

35. The method of pictorial representation defined in claim **[** [1] **] 34**, wherein the directly generated image material includes camera shots.

36. The method of pictorial representation defined in claim 1, wherein the **[** [space related] **] space-related** data are provided with references to further spatial data.

37. The method of pictorial representation defined in claim 1, wherein the **[** [space related] **] space-related** data are provided with references to thematically adjacent data.

38. The method of pictorial representation defined in claim 1, wherein the **[** [space related] **] space-related** data are provided with references to data of the same area with another resolution.

39. The method of pictorial representation defined in claim 1 further including determining a probability for **[** [the] **]** regions surrounding the field of view that the regions will pass into the field of view when there is an alteration in the location or of the angle of view of the observer.

40. The method of pictorial representation defined in claim 39 further including requesting and centrally storing the data of the areas with the highest probability.

41. The method of pictorial representation defined in claim 1, wherein **the** steps (c) and (f) further include transmitting data asynchronously.

42. The method of pictorial representation defined in claim 1, wherein **the** steps (e) and (f) further include showing data on a screen.

**43. The method of pictorial representation defined in claim 1, wherein a plurality of computers can access the plurality of spatially distributed data sources.**

**44. The method of pictorial representation defined in claim 43, further including altering the selectable direction of the view, performing the steps (b) through (g), and determining the data and/or the co-ordinates of the data in terms of a new co-ordinate system.**

**45. The method of pictorial representation defined in claim 44, wherein a pictorial representation is provided to the observer when the selectable direction of the view is altered and the steps (b) through (g) are performed.**

**46. The method of pictorial representation defined in claim 43, further including altering the selectable location of the view, performing the steps (b) through (g), and determining the data and/or the co-ordinates of the data in terms of a new co-ordinate system.**

**47.** The method of pictorial representation defined in claim 46, wherein a pictorial representation is provided to the observer when the selectable location of the view is altered and the steps (b) through (g) are performed.

**48.** The method of pictorial representation defined in claim 43, wherein the step (c) includes requesting data for the field of view from at least two of the plurality of spatially distributed data sources.

**49.** The method of pictorial representation defined in claim 43, wherein the step (c) includes requesting data for the field of view from at least three of the plurality of spatially distributed data sources.

**50.** The method of pictorial representation defined in claim 43, wherein the step (c) includes requesting data for the field of view from at least four of the plurality of spatially distributed data sources.

**51.** The method of pictorial representation defined in claim 43, further including inserting directly generated image material into the representation, wherein the directly generated image material includes images captured by a running camera.

**52.** The method of pictorial representation defined in claim 43, wherein the space-related data are provided with references to thematically adjacent data.

**53.** The method of pictorial representation defined in claim 52, wherein the references are hyperlinks.

**54.** The method of pictorial representation defined in claim 43, wherein the space-related data are provided with references to further spatial data.

**55.** The method of pictorial representation defined in claim 54, wherein the references are hyperlinks.

**56.** The method of pictorial representation defined in claim 43, wherein said at least one of the spatially distributed data sources is located where the space-related data is collected or processed.

**57.** The method of pictorial representation defined in claim 43, wherein the steps (e) and (f) further include representing the data with a two-dimensional polygonal geometrical model of the topography of the object, the spatial relationship of the data being given by the provision of two co-ordinates on the polygonal geometrical model, and further wherein in the two-dimensional polygonal grid model, space-related data are shown on a plurality of different two-dimensional layers.

**58.** The method of pictorial representation defined in claim 1, wherein the step (b) includes determining the field of view using an automatic position-fixing system.

**59.** The method of pictorial representation defined in claim 58, further including altering the selectable direction of the view, performing the steps (b) through (g), and determining the data or the co-ordinates of the data in terms of a new co-ordinate system.

**60.** The method of pictorial representation defined in claim 59, wherein the pictorial representation is provided to the observer when the selectable direction of the view is altered and the steps (b) through (g) are performed.

**61.** The method of pictorial representation defined in claim 58, further including altering the selectable location of the view, performing the steps (b) through (g), and determining the data or the co-ordinates of the data in terms of a new co-ordinate system.

**62.** The method of pictorial representation defined in claim 61, wherein the pictorial representation is provided to the observer when the selectable location of the view is altered and the steps (b) through (g) are performed.

**63.** The method of pictorial representation defined in claim 58, wherein the step (c) includes requesting data for the field of view from at least two of the plurality of spatially distributed data sources.

**64.** The method of pictorial representation defined in claim 58, wherein the step (c) includes requesting data for the field of view from at least three of the plurality of spatially distributed data sources.

**65.** The method of pictorial representation defined in claim 58, wherein the step (c) includes requesting data for the field of view from at least four of the plurality of spatially distributed data sources.

**66.** The method of pictorial representation defined in claim 58, further including inserting directly generated image material into the representation, wherein the directly generated image material includes images captured by a running camera.

**67.** The method of pictorial representation defined in claim 58, wherein the space-related data are provided with references to thematically adjacent data.

**68.** The method of pictorial representation defined in claim 67, wherein the references are hyperlinks.

**69.** The method of pictorial representation defined in claim 58, wherein the space-related data are provided with references to further spatial data.

**70.** The method of pictorial representation defined in claim 69, wherein the references are hyperlinks.

**71.** The method of pictorial representation defined in claim 58, wherein said at least one of the spatially distributed data sources is located where the space-related data is collected or processed.

**72.** The method of pictorial representation defined in claim 58, wherein the steps (e) and (f) further include representing the data with a two-dimensional polygonal geometrical model of the topography of the object, the spatial relationship of the data being given by the provision of two co-ordinates on the polygonal geometrical model, and further wherein in the two-dimensional polygonal grid model, space-related data are shown on a plurality of different two-dimensional layers.

**73.** The method of pictorial representation defined in claim 1, wherein the step (c) includes requesting data for the field of view from at least two of the plurality of spatially distributed data sources.

**74.** The method of pictorial representation defined in claim 1, wherein the step (c) includes requesting data for the field of view from at least three of the plurality of spatially distributed data sources.

**75.** The method of pictorial representation defined in claim 1, wherein the step (c) includes requesting data for the field of view from at least four of the plurality of spatially distributed data sources.

**76.** The method of pictorial representation defined in claim 1, wherein the data are present as pixel graphics.

**77.** The method of pictorial representation defined in claim 1, wherein the data are present as vector graphics.

**78.** The method of pictorial representation defined in claim 1, wherein the data are present in tabular form.

**79.** The method of pictorial representation defined in claim 1, further including inserting information into the representation.

**80.** The method of pictorial representation defined in claim 1, further including inserting directly generated image material into the representation.

**81.** The method of pictorial representation defined in claim 1, further including inserting directly generated image material into the representation, wherein the directly generated image material includes images captured by a running camera.

US RE44,550 E

**15**

**82.** The method of pictorial representation defined in claim 1, wherein said at least one of the spatially distributed data sources is located where the space-related data is collected or processed.

**83.** The method of pictorial representation defined in claim 2, further including altering the selectable direction of the view, performing the steps (b) through (g), and determining the data and/or the co-ordinates of the data in terms of a new co-ordinate system.

**84.** The method of pictorial representation defined in claim 2, wherein a pictorial representation is provided to the observer when the selectable location of the view is altered and the steps (b) through (g) are performed.

**85.** The method of pictorial representation defined in claim 4, wherein a pictorial representation is provided to the observer when the selectable direction of the view is altered and the steps (b) through (g) are performed.

\* \* \* \* \*

**16**